10 W     67
33 SC ¹276

# Lewis *against* Bradford.

The record of a deed, as contained upon the record book, brought into court in the county to which it belongs, is legal evidence, as well as a certified copy of it.

The fact of a tenant in possession and claiming title to land, surrendering that possession and taking a lease from his adversary, will not be conclusive of his right.

A power to sell land cannot be established by parol evidence, though a power to lease for a term not exceeding three years may.

*Quære?* Whether in an action of ejectment, it is competent for the defendant to prove that he had made valuable improvements upon the land in controversy, while in his possession, with the knowledge of the plaintiff, who made no objection.

One who is about to purchase land, is bound to regard information given to him by one who was the agent of the vendor for renting the land, respecting the title; for having received notice of a probable defect of title from such a source, he would not be a *bona fide* purchaser without notice.

[Lewis v. Bradford.]

ERROR to the common pleas of *Bradford* county.

This was an action of ejectment by Timothy H. Lewis against William T. Bradford, for a tract of land in Monroe township, containing 325 acres. The plaintiff, to maintain the issue on his part, gave in evidence as follows:—

That in 1791 the land in controversy was occupied as a sugarbush by one Jacob Bowman and one Stephen Strickland—that they continued so to occupy it for three years. In February 1794 one Jacob Gibson moved on with his family, built a house, made sugar and began to clear land that spring; cleared and planted about 5 acres with corn. Bowman, for some consideration, relinquished his claim to Gibson; Gibson lived there a little over three years, and in the spring of 1797, sold to William T. Mears; about a month after he purchased, Mears sold to one Dogherty, who moved on the land; at this time about 15 acres cleared—a log house—Dogherty lived on it for six or seven years and cleared a good deal—he had from 30 to 40 acres cleared; built a saw-mill, a new log house, a shed, log barn and hovels; he sold to Jacob Bowman for 600 dollars: the clearing was in two pieces—about 8 acres cleared up the Schrader branch, as much as 20 rods of woods between them—the clearing extended up the Schrader branch, from the forks 60 or 70 rods, and as much as 80 rods up the main branch—Dogherty continued to live on the land for some time after he sold to Bowman—Bowman occupied the said mill.

In March 1812, Bowman exchanged this land with one Daniel Gilbert, for a lot of about 30 acres of flat on Towanda creek and some other consideration. Gilbert moved on as soon as the exchange was made, and lived there two years, when he sold to James Lewis, the father of the plaintiff, for 600, dollars, who purchased the property for his brother William Lewis, whose money paid for the farm. Gilbert moved away in January 1815, a little over a year after he sold to Lewis—one Schrader lived in one room of the house; when Gilbert moved out he was put on by Lewis. Schrader continued there until James Lewis moved on the land, which was soon after. James occupied the farm and mill under his brother William, until he died, which was about a year and a half after he moved on. Timothy H. Lewis, the plaintiff, lived with his father at that time, and continued there, with the family, for some time— until the ensuing fall—Gilbert did not clear any land while he owned the farm. He claimed the " Dogherty farm," lying between the main creek and Schrader branch. Dogherty claimed 320 or 330 acres lying there, and had his claim surveyed twice, the first time by one Stephen Bell, and the second time by Samuel Baird, the agent for the Asylum company—William Lewis sold to the plaintiff, Timothy H. Lewis, who paid his uncle for the property in lumber. The plaintiff continued to live on the farm and occupy it until about five years ago. The plaintiff built a new saw-mill on the

land soon after he purchased of his uncle, and made some other improvements on the land.

And the said plaintiff's counsel then called as a witness C. L. Ward, who testified, that he searched, with the due and proper officer, in the commissioners' office of Luzerne county, and could find no assessments of Towanda township; the officer said Mr Williston had a package of assessments and they might be among them. They searched faithfully.

Horace Williston Esq., one of defendant's counsel, being called upon, alleged that he had not those assessments in his possession, and admitted there was no tax assessed in Luzerne county for either 1808 or 1810. Eliphalet Mason being sworn, testified that he was the assessor of Towanda township for 1809, and assessed the land in controversy to William Dogherty, but did not recollect the number of acres, it was the triennial assessment.

Margaret Ingraham, the daughter of said Dogherty, *inter alia*, testified, that her father was called on for taxes while he lived on the land, but for what amount or what years she could not recollect.

And the said counsel further gave in evidence as follows, to wit:—

June 25, 1773.—A warrant to Samuel Clark for 300 acres of land on the south side of Towanda creek, at the junction of a run with the creek, to include a tree marked A B, that stands in the fork about four miles from the river in the county of Northumberland.

Sept. 20, 1773.—Receipt of Edmund Physic for purchase-money of Samuel Clark, 24 pounds 15 shillings.

Sept. 24, 1803.—Survey by T. Sambourne, deputy surveyor, of 325 acres and allowance, in the fork of Towanda creek, about five miles from the N. E. branch of Susquehanna, &c., with a note thereon that it interfered with a survey made for Amy Hooner. Endorsed "No. 65," accepted 3d April, 1804.

Sept. 20, 1773.—Deed poll from Samuel Clark to Samuel Pleasants.

Febr'y. 17, 1775.—Assignment, Samuel Pleasants to John M. Nesbitt.

March 16, 1775.—Assignment John M. Nesbitt to Charles Stewart. The plaintiff's counsel then called Samuel A. Collins, who testified, that he married a granddaughter of said Charles Stewart, that he died in 1800 leaving four children.

1.—Mrs Martha Wilson, a widow, now living.

2.—Mrs. Coltman then widow, afterwards married to one Stranahan, since dead, leaving one son Férand Stranahan, now living.

3.—Mrs Mary Wilson, since dead leaving six children; it is said they live in New Jersey—I am not acquainted with them.

4.—Samuel R. Stewart, since dead, leaving two sons, Charles and Robert, now living.

And the said counsel then gave in evidence, as follows:—

Jan. 25, 1824.—Deed, Ferand Stranahan and wife to Martha Wilson.

X.—G

Oct. 15, 1822.—Deed, Charles S. Stewart to said Martha Wilson.

The said counsel then offered to prove by said William A. Collins, that said Martha Wilson has, for a number of years back, transacted the business of the estate of said Charles Stewart, by selling lands, receiving the pay therefor, and doing all and every act relating thereto, necessary and proper to be done, and that all others, interested in said estate have uniformly acquiesced in and confirmed all her said acts in the premises. Defendant's counsel objected to all contained in the offer, except as to any transactions relating to the lands now in dispute in this case, which objections the court sustained, rejected the evidence, and at the request of plaintiff's counsel, sealed a bill of exceptions.

The plaintiff's counsel then further gave in evidence as follows:—

July 6, 1822.—Letter of attorney from Martha Wilson to Jonathan Stewart to sell lands, &c.

Feb. 23, 1828.—Article of agreement, heirs of the late Charles Stewart, by Jonathan Stewart, their agent to the plaintiff for the consideration of 600 dollars.

And the said counsel for the plaintiff gave in evidence from the assessment rolls of Bradford county, showing the land to have been taxed in the names of Daniel Gilbert, James Lewis, William Lewis and Timothy H. Lewis, from 1812 to 1834, inclusive.

And thereupon the defendant's counsel to maintain and prove said issue on his part gave in evidence as follows:—

July 30, 1784.—Warrant to Amy Hooner for 300 acres of land in Nittany valley, to include the north branch of Spring creek, about three miles westward of land this day granted to Mary Hooner in the county of Northumberland.

August 10, 1786.—Survey of 306 acres and allowance on the south side of Towanda creek in Luzerne county or Northumberland. Note—the land this warrant was originally intended for is included in old surveys.

Jan. 2, 1788.—This survey was returned.

Sept. 26, 1800.—Patent to Stacy Potts, (except the recitals,)

Jan. 1, 1810.—Deed from Stacy Potts to William Potts, George Sherman, Joseph Potts and Stacy Potts, jun., for the consideration of 600 dollars.

And the defendant's counsel then offered in evidence the record book from the recorder's office of Bradford county, containing the record of a deed dated March 18, 1837, from William Potts and Ann his wife, Rebecca Sherman and others to the defendant, and offered to read said deed in evidence to said jury therefrom. The plaintiff's counsel objected to the record being read in evidence, and the court admitted it to be read, whereupon the plaintiff excepted to the opinion of the court; which said deed was then read in evidence to the jury from said record book; and further proved, that the return of survey so made for said Amy Hooner, would apply to the lands in controversy.

And the said counsel for defendant, then further gave in evidence the record of the circuit court of the United States for the district of Pennsylvania, Richard Smith, lessee of William Potts *et al., v.* William Stiles, with notice to Daniel Gilbert in ejectment, entered at September session 1817, or of November session 1816. Defendant takes special defence for 200 acres or thereabouts, part of the premises in question, &c ; verdict and judgment for plaintiff.

April 22, 1830.—*Scire facias post annum et diem* against Daniel Gilbert and tenants; returned served. April 18, 1832, judgment for want of a plea. February 4, 1833, writ of *habere facias possessionem* issued; returned, land delivered to plaintiff, &c.

And the counsel for defendant, then offered in evidence a deed, dated February 20, 1833, from the plaintiff to William Potts *et al.*, granting them the privilege of maintaining the saw-mill dam, at the end opposite the land in controversy, on other land of plaintiff, &c., to which evidence the plaintiff's counsel excepted, alleging the same to be irrelevant; the execution of said deed being admitted, the court admitted the evidence, and at the request of plaintiff sealed a bill of exceptions.

The said deed was then read in evidence to the jury, and the defendant's counsel further gave in evidence, a lease from William Potts to Thomas Elliott, for the lands in controversy, the rent to be paid to plaintiff as the consideration for the abovementioned conveyance, for the privilege of abutting said dam on lands of plaintiffs.

The counsel for defendant called as a witness one Thomas Elliott, who, *inter alia*, testified, that Lewis occupied the land as a tenant under Potts for two years, the rent for which he received or accepted as the consideration for the deed for the dam privilege, instead of the 200 dollars consideration, mentioned therein, by assent of said Elliott; said Lewis agreeing to surrender peaceable possession to Potts, on the expiration of his said term. He continued in possession until the sale to Bradford, the defendant, when he surrendered it to defendant. At the time possession was delivered to Potts, by the marshal, the witness was in possession of the mill, &c., under an agreement with Lewis.

William Keeler, being sworn, testified as follows:

Bradford called on me before he purchased. Lewis occupied the premises till Bradford came to purchase. I had a partial care of the property for Potts. I rented it to Lewis, verbally, for two years after Elliott's lease expired, on the same terms. I settled with him for one year, the other is unsettled. I settled with Potts for Lewis. Lewis knew of Bradford's intention to purchase. My authority came through Elliott.

The counsel for defendant offered to prove that " when Bradford purchased, the farm and mill were much out of repair; and that Bradford, after he purchased and took possession, made valuable and expensive improvements before this suit was brought. Timothy H. Lewis living continually in view while such improvements

[Lewis v. Bradford.]

were making, without any claim of title or objection on the part of
Lewis." To which evidence the plaintiff's counsel objected. The
court admitted the evidence, and at the request of plaintiff's coun-
sel, sealed a bill of exceptions.

And thereupon the counsel for defendant gave in evidence, in
substance as follows, to wit:

That when Bradford purchased the place, it was out of repair.
That he cleared and sowed 6 acres of new ground, put up the
fences, repaired the barn and saw-mill, cut the brush on a pasture
lot, made some new fence, &c.; and then called Adam Wilson, who
testified as follows: " I called with Mr Bradford at the place, at
Mr Lewis's house. Bradford told him he came to look at the place.
Lewis said he would as lief he had it as another; but he must be
sure to get a good title if he bought. Lewis said nothing else to
him but what I have mentioned, that I remember. It was while
snow was on the ground, and I think we went up in a sleigh. I
went up with Bradford. They did not appear to be strangers. I
expect they had met at some time. I did not hear Bradford ask
for any explanation. I was not with them all the time. I think
they went out together—whether to the mill or not I cannot say.

And the counsel for the said plaintiff then called Eliphalet Mason,
who testified as follows:

Mr Bradford called on me soon after he had purchased, and I
understood from him that Elliott and Keeler had given him a history
of all Mr Lewis's claim. I can't say whether he purchased or not
when he then called on me.

The plaintiff's counsel then offered to prove by said Eliphalet
Mason, that prior to Bradford's purchase of the land in controversy,
to wit, in 1835, he was employed by the plaintiff to search for papers
preparatory to commencing a new ejectment for the recovery of the
land in controversy. That he did make such searches, and acted
under such employment, by said Lewis, and was employed in said
capacity, down to some time in the year 1837.

That in the spring of 1837, the first time he ever saw defendant,
Bradford, he called upon the witness, and said he had been sent to
him by Elliott and Keeler, for information respecting Lewis's claim.
That, at that time, he informed defendant that Lewis intended to
commence a new ejectment, was making preparation therefor, and
if Lewis could make certain proof, he would, in the opinion of the
witness, recover the land.

The court rejected the evidence, and plaintiff's counsel excepted.

William Keeler was then recalled.

I had nothing to do with the sale of Potts to Bradford. George
A. Mix made the bargain with him. My agency was with regard
to the renting to Lewis, and continued such agent up to the time
the place was sold. Potts afterwards recognized it by settling with
me with regard to it.

The plaintiff's counsel then offered to prove, by said William

[Lewis v. Bradford.]

·Keeler, that during the negotiation between Mix and Bradford, for the sale and purchase by Bradford, of the land in controversy, and before the purchase was concluded, he informed said Bradford that the plaintiff, Lewis, had a claim to the land.

Rejected, and exception taken by plaintiff.

The plaintiff prayed the court to charge the jury,

" 'That if the jury find that the plaintiff was in possession of the land, at the time of the purchase of the land by Bradford, such possession was notice to the defendant of Lewis's claim to the land."

The court answered this point by instructing the jury, that Lewis at that time being in possession, as the tenant of Bradford, his possession was not notice of any other title than that which he derived under the lease.

The opinions of the court, as contained in each of the exceptions to the admission and rejection of evidence, and their answer to the plaintiff's point, were assigned for error.

*Baldwin* and *Case*, for plaintiff in error.
*Williston* and *Overton*, for defendant in errror.

The opinion of the Court was delivered by

Huston, J.—The plaintiff in this case showed an improvement by actual settlement on the land in question, regularly transmitted, and continued from 1794 till 1817. At this time an ejectment was served at the suit of William Potts on Daniel Gilbert. By the testimony in this case, Gilbert had sold to Lewis, in 1814, and in the assessment of that year, the land is assessed to Lewis, and Gilbert removed to another lot a few miles distant. There was a recovery against Gilbert in that suit, in 1818, but no writ of possession. In 1830, a *scire facias* issued against Daniel Gilbert and tenants; Gilbert had been dead many years. Some question was made, as appears by the charge of the court, whether either the ejectment or *scire facias* were served on the person in possession, and there is no error in the charge in this particular. If the *scire facias* was not served on Lewis, it would strengthen his case.

The plaintiff here showed not only the above right by actual possession, continued more than twenty-one years, but also traced the title through James and William Lewis, to the plaintiff, T. H. Lewis, who, in 1828, became the purchaser of a warrant and survey from the heirs of Stewart, and the plaintiff produced in evidence that title, as follows:—

June 25, 1773, warrant to Samuel Clark for three hundred acres of land, on the south side of Towanda creek, at the junction of a run with the creek, to include a tree marked A. B., that stands in the fork about four miles from the river, in the county of Northumberland. September 20, 1773, receipt of Edmund Physic to Samuel Clark, for 24 pounds 15 shillings, the purchase-money. September 20, 1773, deed poll from Samuel Clark to Samuel Pleas-

x.—G*

[Lewis v. Bradford.]

ants. February 17, 1775, assignment of this to John M. Nesbit. March 15, 1775, assignment to Charles Stewart. September 24, 1803, survey by T. Sambourne, deputy surveyor, of three hundred and twenty-five acres, in the fork of Towanda creek, about five miles from the northeast branch of the Susquehanna, &c., &c., with a note thereon, that it interfered with a survey made on a warrant to Amy Hooner. Accepted in surveyor general's office, April 3, 1804.

The death of Charles Stewart, in 1800, was proved, and that he left four children: 1. Martha Wilson, a widow now living; 2. Mrs. Collman, twice married, now dead, leaving one son, F. Stranahan. 3. Mrs. Mary Wilson, now dead, leaving six children. 4. Samuel R. Stewart, now dead, leaving two children, Charles and Robert, now living.

Then the plaintiff read a deed, January 25, 1824, F. Stranahan and wife to Martha Wilson; October 15, 1822, Charles S. Stewart and wife to Martha Wilson. And offered to prove by parol, that Mrs Martha Wilson for many years has acted as agent for the other heirs, in leasing and selling the lands of the estate, and that the other heirs have acquiesced in, and confirmed her acts, &c.

The court rejected this offer. A power to make a lease under three years, or to pay taxes, &c., may be proved by parol, but a · power to sell, in fee, cannot be so proved. The court was right; an express recognition, and a receipt of his proportion of the purchase-money, knowing it to be the purchase-money, might be given in evidence under certain circumstances, as a receipt for price of land on a parol sale may be.

July 6, 1822, power of attorney, Martha Wilson to Jonathan Stewart, to sell lands, &c., &c. February 23, 1828, article of agreement, Jonathan Stewart, stating himself to be agent for the heirs of Charles Stewart, with the plaintiff; consideration 600 dollars.

The plaintiff then showed assessment to Daniel Gilbert of thirty acres improved, two hundred and seventy woodland, and saw-mill, in 1812; and the same in 1813. In 1814, the same property is assessed, and stated to be transferred to James Lewis. The law directs the assessor to notice any transfers of possession each year. They also showed assessment of some property, together with some adjoining wildlands, to the Lewises, till the plaintiff was dispossessed, and proved that the land had been taxed and taxes paid in Luzerne county in 1809, before Bradford county was created.

The defendant gave in evidence—July 20, 1784, warrant to Amy Hooner for three hundred acres of land in Nittany valley, to include the north branch of Spring creek, about three miles westward of land this day granted to Mary Hooner, in the county of Northumberland. August 10, 1786, a survey of three hundred and six acres on the south side of Towanda creek, in Luzerne county, or Northumberland, with a note, that the land which this warrant was originally intended for, is included in old surveys.

It was admitted here, that it called for land at least one hundred

miles from where it was laid. There is no case in which it has been decided, that a warrant removed one hundred miles is in a worse situation than if removed one mile or ten miles. I apprehend, however, it must be surveyed within the district of the deputy surveyor to whom it was directed. On 2d January 1788, it was returned to the office of the surveyor-general. September 26, 1800, patent issued to Stacy Potts, (this was admitted except the recital of the intermediate conveyance from Amy Hooner to Stacy Potts.) January 1, 1810, deed from Stacy Potts to William Potts, George Sherman, Joseph Potts and Stacy Potts, Jr. (his sons and son-in-law); consideration 600 dollars.

The defendant then offered the record book from the recorder's office of Bradford county, containing the record of a deed, March 18, 1837, from the last named grantees to defendant; and offered to read the same in evidence to the jury; this was objected to; and admitted, and formed the second bill of exceptions to the evidence, to which I shall recur after stating the defendant's title. He also showed a record of a suit in the circuit court of the United States for the district of Pennsylvania; the much spoken of case of Lessee of William Potts *v.* Daniel Gilbert, found in *3 Wash. C. C. Rep.*; it was returnable at April session 1817; the old form of ejectment, *supposed a previous writ*, which in fact was never issued, on which the declaration was founded; tested in November 1816, returnable to April 1817, and a verdict and judgment for the plaintiff, on which no further proceedings were had until a *scire facias post annum et diem*, returnable to April 1832. It issued against Daniel Gilbert and tenants; judgment for want of appearance, and a plea and writ of *habere facias possessionem* issued on 4th February 1833, and returned "possession delivered." As there was no objection to this record, it was not brought here, and we do not know on whom it was served. The proof was that Daniel Gilbert had been dead many years, and that Elliot and Whitten were in possession as tenants of Lewis; whether it was served on them, or Lewis had any notice of it, we do not know. I have spoken of these proceedings before. I shall go back to the two points as subject of dispute, before I notice what took place after the marshal delivered possession.

And the counsel of the plaintiff insisted the patent did not vest title in Potts, because no receipt for the purchase-money was produced. This reason will not support the objection; since the opening of the office after the revolutionary war, no warrant could legally issue until the purchase-money to the state was paid, and warrants and surveys have been constantly read without producing the receipt for the purchase-money. It is only where two persons contend as to their title to a warrant, or where an actual settler or other person in possession, is put in jeopardy by some person claiming under a warrant, that it becomes necessary for the party claiming it to show some legal or equitable right to that war-

.rant. The production of a warrant is *prima facie* evidence that the purchase-money has been paid to the state. It may be some presumptive evidence, that it was paid by the person to whom the warrant was granted, or by him in whose name it was granted, more correctly speaking; but, as in this case, it is no evidence that the purchase-money on the warrant to Amy Hooner was paid by Stacy Potts. The presumption being that it was paid by her, Stacy Potts must show a conveyance from her, or that he himself paid the state for that warrant, or that he has a conveyance from ·her or from the person who did pay for it. The patent from the state to Stacy Potts is good for all right the state had at its date; but it is not good against Amy Hooner, unless the patentee can show a right from her; nor is it good against any person who in any way, either by warrant or settlement, had acquired a warrant or a right to a warrant before the date of that patent. See Penrose *v.* Griffiths, 4 *Binn.* 231, and the opinions of Tilghman and Yeates fully on this subject. The dissenting opinion of Bracken-. ridge arose from losing sight of the principle, that a defendant is ˙safe until the plaintiff show an unexceptionable title; and in Bonnet *v.* Devebaugh, 3 *Binn.* 175, and following pages, the right of Croyle was saved by his actual possession before the patent was granted to his adversary. The patent, then, was not satisfactory, but this, not because the purchase-money had not been paid to the state, but because there was no title from the person who paid it to Stacy Potts; and such seems to have been the opinion of the court, for the *recitals* were not admitted as evidence against Lewis, whose title commenced prior to the patent.

The next exception was as follows:—It was admitted that the copy of a deed from the record book was evidence, but denied that the book itself, when brought into court and read, was evidence. Our first act on the subject is that of 1715, which says, "there shall be an office of record in each county of this province, which shall be called and styled the office for recording deeds." After directing the appointment of recorders and mode of proof or acknowledgment of deeds and the effect of recording, it provides in the fifth section, "and the copies or exemplifications of all deed, so enrolled, being examined by the recorder, and certified under the seal of the proper office, (which the recorder is hereby required to affix thereto,) shall be allowed in all courts where produced, and are hereby declared and enacted to be as good evidence, and as valid and effectual in law, as the original deeds themselves," &c., &c.

This act and the construction of it, have come down to us from the early part of last century, and it would be strange, but not useful to change, and in fact destroy it by an affectation of grammatical accuracy. It was argued as if copies of the record from that book were made evidence; so they are, and must be, or the act is useless; but the words of the law are, that copies of the deeds, &c., are to be evidence. Now the record book is a copy of

the deed, or it is nothing; and a copy of the book cannot be a direct copy of the deed. Copies from the record, or the record, have always been admitted as evidence. This construction, so long acted on, I consider as fixed as the most express words could make it. The propriety of permitting a book of records of many deeds to be brought into court on all occasions, is another matter. If any party, to save expense of a copy, may have it brought into court, it may be sent out with the jury, who often sit in rooms, or may be taken to taverns at arbitration, and much danger incurred and great injury done. The recorder ought not to give his book out of his office, except on an order of the court, and if so ordered, ought to be taken there and back by himself or one to whom he intrusts it.

I have stated, that the possession was traced down from 1794 until Potts was put in by the marshal. The tract of country in which the land in question lay, was within the Connecticut purchase. By an act of assembly, passed in the session of 1794–5, to transfer a Connecticut title, was made an offence punishable by fine and penitentiary confinement. By another act of April 6, 1802, all deeds which did not recite the substance of the warrant, or office title or patent from the late proprietary, or from the state, are made void: a penalty of 200 dollars is imposed on any judge or justice who shall take an acknowledgment of any such deed, and the office of any recorder who shall record any such deed, is forfeited. This law extended only to Wayne, Luzerne, and Lycoming counties, and was intended to prevent conveyances of Connecticut titles. By an act passed in 1800, the statute of limitations, as respected these titles, was repealed. The words of the act of 1802 included all conveyances of rights by improvement. Under these laws, a circumspection, in speaking of titles, became common in that part of the state; those who had Connecticut titles denied them, or evaded mention of them, and the phrase "possessive right," was then in general use. All these acts of assembly are long since repealed, and were never known to the younger members of the profession of law; but it is proper and even necessary to recur to them in some cases. Transfers of improvement rights were made by parol, or if by deed, the deed was concealed, could not be proved, or acknowledged, or recorded. In this case, several of the sales were perhaps by parol, payment of consideration and delivery of possession; some were by deed, and the deeds could not be proved. In the circuit court, these transfers were treated as nullities, and proof of transfers by parol, as unavailing. Evidence was offered and rejected, showing that the delay of the plaintiff, in bringing this ejectment, was occasioned by time spent in searching for these deeds, and the fact that those in possession, while the benefit of the statute of limitations was taken from them, spoke of their possessive rights, and not claiming right of soil, was proved. The charge of the court on this part of the case was correct.

[Lewis v. Bradford.]

The tract in question lay in the forks of what is now called the Shrader branch and the main creek. Timothy H. Lewis lived on, and owned the land on the opposite side of the Shrader branch, and one end of the dam of the saw-mill abutted on his land on that side of the stream. Lewis was proved to have been indebted to a Mr Elliot, and had put this man in possession of the tract in question and the saw-mill, by an agreement to let him continue two years, to discharge this debt. When Potts came with the marshal to take possession, and had taken possession, Lewis threatened to cut down the end of the dam which abutted on his other land, and thus destroy the saw-mill. Elliot had leased the land in question from Potts, as soon as it was given into his possession. By his account of the matter, and through his interference, Lewis was prevailed upon to agree to give Potts the right of continuing the dam against his other land; for this grant Potts was to give him 200 dollars, which was to come out of the rent as it fell due from Elliot to Potts. Elliot says he considered the case of Lewis hopeless, and advised him to take this 200 dollars as being better than nothing, and his only chance of ever getting any thing. This deed was offered in evidence, as some proof of a relinquishment of his claim, and admitted and exception taken. There was no error in admitting it. I shall notice this again. After Elliot's lease, which was for two years, had expired, Mix and Keeler, as agents for Potts, leased to Lewis, who lived opposite, and had undertenants on the land in question. This fact of his having taken a lease as tenant under Potts, was also relied on as evidence of relinquishment of his claim. The judge put the case principally on another point; but it may be well to notice this. In Richardson *v.* Stewart, in 2 *Serg. & Rawle* 87, 88, a similar point arose; at one previous trial Richardson had recovered against Stewart. The right of Richardson was by articles of agreement vested in Mr John Haldeman. The late Judge Walker, then at the bar, accidentally fell into company with Stewart, who had a large crop of wheat nearly ripe, (it was in June,) and corn and oats growing; he had been told that Haldiman or Richardson would take all his crop; he was in great trouble, and, on an offer by Mr Walker, that if he would give no more trouble, and would take a lease and become a tenant, he would be permitted to keep a tenant's share of the crops in the ground, he took the lease, got the grain, and, according to his contract, went off at the end of the year. As Richardson was also on part of the tract, Stewart did not discontinue an ejectment he had pending for that part, and he brought a new ejectment for that which had been recovered from him. These matters were urged as barring his right; it stayed his new ejectment until he restored the possession, but it was not a release of his right; and the fact that the bargain was made with a man in trouble, who had just lost a cause before a judge of the supreme court

at a circuit court, it had no avail with the court or jury. I was his counsel, he recovered the land, and his descendants own it yet.

I now come to the point on which the cause turned in the court below, and to notice the evidence given and evidence rejected, of what occurred about the time Bradford purchased. The question was, is he a *bona fide* purchaser, for valuable consideration, without notice? or perhaps, also, did Lewis know Bradford intended to purchase, and conceal his claim and intention to renew his suit? In judging of this, we must consider what was offered, and what it would have amounted to if proved. In very few cases, if in any case, is it necessary to prove all a party wants by one witness—if the testimony of several witnesses makes out a fact, or facts, it is enough, and as good as if proved by one. It was, to put it in proper order, offered to prove, that when he went to Mix and Keeler to purchase, Keeler, who was Potts's agent, and leased the land in question, and collected the rents, told him of Lewis's claim. Keeler, to be sure, did not make the contract to sell, that was done by Mix; but information of an adverse claim by the grantor, or his agent, cannot be considered too loose to be noticed. It was further offered to prove, that Keeler and Elliott (who knew something more than loose talk) told him to go to E. Mason, Esq. for information. To prove that Mason had been employed for some time in searching for testimony for Lewis, that Bradford did go to Mason, who told him Lewis was preparing to bring a suit, and if he could procure certain proof (probably the lost deeds), he would, in Mason's opinion, recover the property. Now if Lewis was preparing to bring an ejectment, he must have intended to go out of possession. Baldwin had gone to Lewis's house, on an adjoining tract, and with him in a sleigh a Mr Wilson. His testimony I will give in his own words, so far as relates to this matter. " We called at Lewis's house; Bradford told him he came *to look at the place.* Lewis said he would as lief he had it as another, but he must *be sure and get a good title if he bought.* Lewis said nothing else to him but what I have mentioned." On being cross-examined, he said: " Bradford did not ask for any explanation. I was not with them all the time. I think they went out together—whether to the mill, I don't know."

First, ought the evidence of Keeler and Mason to have been received? We have not much in the English books on the subject of actual notice, though a great deal as to constructive notice. Sugden says, generally, that loose reports are not notice; and he cites chancery cases, and gives an abstract to this purpose as full as the case itself. A person is about to purchase, and A tells him the man has no title, except in trust for another. B contradicts this, and says the man holds the land absolutely, and not in trust. He purchases, and it turns out that the information given by A was correct. Held, that he was an innocent purchaser, for he could not know which was true. But Sugden immediately adds, that he would not advise a pur-

[Lewis v. Bradford.]

chaser to rely on this, and cites a *dictum* of Lord Hale: that if necessary he would consider there was notice: "there might have been a noise in the house:" meaning, I suppose, a report or talk in the family. But suppose the purchaser had only heard what A told him—would this, without contradiction, have been held no notice? I have found no English case which says so. In point of fact, this matter of purchase, without notice, is generally, perhaps always, decided in chancery according to Maddock's Chancery Principles and Practice, vol. ii, p. 323–4. The bill states the facts from which notice of an adverse claim is inferred. It is not sufficient to plead a purchase without notice, actual or constructive; but defendant must, by a full, clear, and substantial answer, (*not merely as to knowledge and belief,*) as well as by averment in the plea, deny the facts from which notice is inferred—though he need not go beyond what is alleged, and rip up his whole title—and must plead that the vendor was in possession by himself or tenant. That he had no notice before the conveyance, and before the purchase-money actually paid, not merely secured to be paid. Harris *v.* Southcote, 1 *Atkins* 538; Story *v.* Lord Windsor, 2 *Atkins* 620; Hardingham *v.* Nichols, 3 *Atkins* 304; 3 *P. Wms.* 307; 2 *Vesey, Jun.* 454–8. It is still left open to the other party to contradict the denial. This often occurs on a bill for discovery, or bill for injunction; when adverse possession is alleged as notice. It is no excuse that he was only told of an adverse possession; he is bound to go and see—why when told of adverse title is he not bound to inquire? If he be told the person in possession is a tenant, he is bound to ascertain whether the tenant has any other title. *See* 7 *Watts* 276, and cases there cited. I shall not in this case undertake to state any general rule. It depends, says Chancellor Kent, 4 *Kent* 179, on the infinite variety of circumstances in each case. All the cases agree that notice to an agent is notice to principal; and though I do not remember a case, it is clear that notice from a vendor, or the agent of a vendor, is of equal effect; and who will say, that, when an agent or vendor is applied to, to sell lands, and the vendee is informed there is an adverse claim, and that J. S. can tell the whole nature of it, and whether ever it will be prosecuted, this is not notice? The man goes to J. S., who tells him there is a claim, and if a paper can be found that claim will take the land. I do not understand that the judge would have rejected this evidence, if it had not been for the testimony of Wilson, which, in the hearing of a tedious and perplexed case, struck him in a different light from what it does this court. It must be recollected that Keeler had sworn that the lease to Lewis was to expire in the ensuing spring, and that Lewis was bound to give up the possesssion. There was no evidence that he had ever applied to continue or renew it. In judging of the admissibility of evidence, we look at the effect of it, if given. Lewis will then be a man who intends to bring a suit, and must remove from the land to enable him to do so. Baldwin comes and says, I am come to look at the

place. Lewis says, I would as lief you came on as another—this only adds another proof that he did not intend to continue tenant— " but be sure to get a good title if you buy." It struck this court as a clear intimation, at least that Baldwin ought to be careful—it would have induced any other man to inquire what was meant by this advice. If Baldwin had made any reply, or asked any question as to title, and Lewis had concealed his claim, he might have been postponed. But he was not bound to tell his claim to every man he met. He gave a distinct intimation, that, to a person proposing to purchase, care and circumspection were necessary, and that the subject was not pressed farther, was the fault of Baldwin and not of Lewis—and this is more clearly so, if Keeler, and Elliott, and Mason, or any of them, had told him of Lewis's claim. The case of Overfield *v.* Christie, 7 *Serg. & Rawle* 173-7, had put the decision, or rather the law, as laid down in Potts *v.* Gilbert, clearly out of the way as to a great part of it. That case will throw light on the state of the country, and the situation of the people there, and of the laws of this state relating to that section of country.

We are of opinion, the testimony offered in these two bills of exceptions, ought to have gone to the jury, and that they should have been told that unless Lewis distinctly understood Baldwin was in treaty for a purchase, he was not bound to tell of his claim; and if he did suspect an intention to purchase, that he gave a fair opening to full information, and that Lewis's title ought not to have been treated as totally destroyed by what Wilson testified; and at all events, the truth of his testimony ought to have been left to the jury—and to enable the jury to judge fairly of it, the rejected testimony of Keeler and Mason ought to have been received.

There was another bill of exceptions, as to proof of improvements made by Baldwin since he came on. It was admitted, and proof given, that the use of the property was worth double the amount expended in improvements. The whole, then, was mere waste of time in this case. It is not necessary to state, whether a person sitting by and using permanent and valuable improvements, made of value equal to or exceeding the worth of the land, may not raise an equity—certainly, in a doubtful case, they would weigh with a jury. And it is possible there may be cases in which all this would not postpone a right—but the facts of this case raise no such question. In 1 *Serg. & Rawle* 520-1, the assertion was, that two verdicts and judgments (before our act of 1807) in ejectment in favor of defendant and his ancestors, and seventeen years acquiescence by Kyle, were a bar in that ejectment. The common pleas answered " they are not a bar;" and certainly they are not, said this court.

In Pedrick *v.* Searle, 5 *Serg. & Rawle* 236, there was a recovery by plaintiff. The defendant had been more than twenty-one years in possession; after the recovery, he took a lease for the improved

x.—H

[Lewis v. Bradford.]

part; the plaintiff sold his right, but, on a new ejectment, the right by twenty-one years' possession prevailed and recovered the land. The supreme court of New York, in 3 *Johns.* 270, say, "a recovery is of the possession, (not of the seisin or freehold,) without prejudice to the right, *as it may afterwards appear*, even between the same parties. He who enters under it, in truth and in substance, can only be possessed according to his right. If he has a freehold, he is in as a freeholder; if he has a chattel interest, he is in as a termor; if he has no title, he is in as a trespasser. If he has no right to the possession, then he takes only a naked possession. 1 *Burr.* 614.

We have a case which says, that in a case where a man has purchased without notice, and another has an equity, and sues on that equity, he must indemnify the purchaser by refunding what has been paid by him. Youst *v.* Martin, 3 *Serg. & Rawle* 423. It is admitted that this is an innovation on what was the rule in chancery before, and I think we have more than one case decided on the principle, that notice before payment of all the money, is sufficient. Alterations are not always amendments. If it should happen that Lewis recovers the land, whether ought Potts or Lewis to repay to Baldwin the sum he has paid. If the jury find notice to Baldwin, before he purchased, this point does not arise.

I am at a loss to say why it was laid down in this case, that Lewis was bound to prove that he gave notice. This can only apply where the proof is that he was personally informed by Baldwin that he was about to purchase—or those only if Baldwin was ignorant of his claim. This was decided at Pittsburg, in a suit between Jack and Blair, for a house in Kittaning. To avoid future disputes, I would also refer to Rogers *v.* Hall, 4 *Watts* 359, where it is said, the receipt on a deed is not evidence of actual payment by a person claiming as a purchaser for valuable consideration.

Judgment reversed, and a *venire de novo* awarded.