## Pierce *against* M'Keehan.

A bequest to A. of "all the residue and remainder of my estate, of whatsoever kinds the same may be, subject to the maintenance of my son J., during his natural life," that residue consisting of personal estate, creates a trust for the benefit of J., and makes A. the trustee.

The conversion of a trust fund into money, and from money into land, does not devest the trustee of his fiduciary character; and a court of chancery will follow the fund for the benefit of the *cestui que trust*, wherever it can be identified.

The equity powers of our courts over cases of trust are sufficient for the protection of the *cestui que trust*, and when the amount of the fund is uncertain, it may be ascertained through the medium of a jury.

ERROR to the Special Court of Common Pleas of *Cumberland* county.

Andrew Pierce for the use of A. D. M'Bride and John M'Clay, his assignees, against Robert M'Keehan.

This was an action of debt on two bonds, for real debt, $891 each, of Robert M'Keehan to Andrew Pierce, dated 3d of April 1837, and falling due 1st of April 1840 and 1841, and given by M'Keehan to Pierce in payment for a tract of land, formerly the property of Joseph Pierce, which, by divers mesne conveyances, became vested in Andrew Pierce. On the 22d of June 1838, Andrew Pierce made a voluntary assignment of all his estate, real, personal and mixed, to M'Bride and M'Clay, for the benefit of such creditors as should release Pierce within 60 days—certain of whom did release.

The defence to the action was made for Joseph Pierce, on the ground that the money which the plaintiffs sought to recover, was a trust fund which did not pass to the assignees of Andrew Pierce, but belonged to Joseph Pierce; and his trustee, Archibald M'Allister, was entitled to it. To maintain this defence, the defendant gave in evidence the will of Jane Jacobs, the mother of Andrew and Joseph Pierce, which contained the following clause:

" I give and bequeath to my son Andrew, and to his heirs and assigns, all the residue and remainder of my estate, of whatsoever kinds the same may be, subject to the maintenance of my son Joseph, for and during his natural life; he shall be supplied with good clothing, boarding, washing and lodging. I also release and exonerate my said son Andrew from the payment of any balance of dower which may be due from him to me at the time of my decease. Lastly, I nominate and appoint my son Andrew, and Alexander M. Kerr, the executors of this my will, revoking all other wills," &c.

For the purpose of showing what the residue of the estate was

[Pierce v. M'Keehan.]

which Andrew Pierce received under this clause of the will, the defendants gave in evidence certain judgments of Jane Jacobs against Joseph Pierce upon which his real estate was sold for $5000, to David Nevin, of which Andrew Pierce received, after the death of his mother, from the sheriff, the sum of $3486.82. It was also shown that Andrew Pierce was indebted to his mother in a large sum of money. David Nevin sold the same land for $5230.70, to Andrew Pierce, who sold it to Robert M'Keehan, the defendant, and took his bonds for the purchase money, of which those in suit were two.

The defendant also gave in evidence a petition of Joseph Pierce to the Common Pleas, setting out all the foregoing facts, and that Andrew Pierce had ceased to support him, and was then insolvent, and praying the court to dismiss him: and the court did dismiss him and appointed Archibald M'Allister in his place, and decreed that the trust fund should be paid over and delivered to him, and directed an attachment to issue against the fund in the hand of Robert M'Keehan.

Paul S. Pierce sworn. Andrew Pierce never paid anything to mother on the recognizances. He gave bonds in lieu of the recognizances. I think the money Andrew received on the judgments was vested in the purchase of the land from Nevin. I know the money was invested in the purchase of this property. I was intimately acquainted with Andrew's business. He said the money was invested in this property. The hand money of the property he sold to Doner, went into his business at Pittsburg. He was accountable to Mr Nevin on record for a sum of $1500 or $2000. This was paid out of the property he sold to M'Keehan. Joseph lived on the place bought from Nevin for three years after Andrew went to Pittsburg. The place was leased for Joseph's boarding and $200. Joseph is not able to support himself. He is very intemperate, and was so in the lifetime of his mother.

Alexander M. Kerr sworn. After Andrew had got this money in his hands, he said he would invest it in real estate in the west. He went to the west and returned. He then said he would lay the money out in the purchase of this farm, and he did buy the farm. He invested this money which he got from the judgments in the farm. I know that Joseph was boarded with the tenant.

The court below charged the jury that upon all the evidence given, there was no legal defence, and the plaintiff was entitled to recover.

*Graham* and *Biddle*, for plaintiff in error. The will created a trust fund for the benefit of Joseph Pierce, 3 *Vez. Jr.* 7; and that fund was shown to be vested in the land sold to M'Keehan. This trust fund would not pass by the assignment to the creditors. 7 *Johns. Ch.* 52; 3 *Rawle* 203; 1 *Penn. Rep.* 261; *Har. Dig.* 365; 4 *Wash. C. C.* 105; *Willis on Trusts* 185; *Lewin on Trusts* 201.

III. — 36   y *

[Pierce v. M'Keehan.]

*Gallaher, contra,* argued that there was no trust created by the will; and if there was, there was such an intermingling of the funds, that there is no evidence of that now claimed being the same. *Willis on Trust.* 88; *Lewin on Trusts* 130; *Green's Rep.* 343. But these bonds have been assigned for a valuable consideration, and are now the property of *bonâ fide* purchasers without notice of this which is now called a trust. 2 *Johns. Chan.* 479, 182, 441; 1 *Rawle* 282.

The opinion of the Court was delivered by

HUSTON, J.—Jane Jacobs made her will in 1827; of which the following clause was material in this case. "I give and bequeath to my son Andrew, and to his heirs and assigns, all the residue and remainder of my estate, of whatsoever kinds the same may be, *subject to the maintenance of my son Joseph, for and during his natural life; he shall be supplied with good clothing, boarding, washing, and lodging.*" Under this will, it was stated that Andrew Pierce, the devisee, received above $6500.

On the 24th of March 1828, Andrew Pierce, the devisee, purchased from D. Nevin a tract of land, for which he gave $5230.70. On the 24th of March 1837, he conveyed this land to M'Keehan for $7159.29, who paid all but two bonds, each for $891, payable on the 1st of April 1840 and 1841. It was proved, and not contradicted, that Andrew Pierce bought and paid for the above tract out of money received under the will of his mother, Jane Jacobs. Andrew supported Joseph by leasing this farm for the boarding of Joseph, (who lived with the tenant), and $200 a year, until the land was sold to M'Keehan. About the time of the sale to M'Keehan, Andrew went to Pittsburg, and engaged in trade; and on the 22d of June 1838, he assigned to A. D. M'Bride and John Maclay, for the use of such creditors as would release; and certain of them did release.

At an August court 1838, Joseph Pierce presented his petition, stating minutely the above facts, and that Andrew had ceased to support him, and was believed to be insolvent; and praying the court to grant a citation to Andrew to appear, &c. and abide the order and decree of the court; and in the mean time, to attach the debt due from M'Keehan to Andrew, for the security of Joseph's maintenance. The citation and attachment issued, and were served. At November court 1838, Andrew appeared, and not giving security to perform the trust, according to the order of the court, he was dismissed by the court, and Archibald M'Allister appointed trustee in his place.

This suit was instituted in this form, to try whether the assignees of Andrew Pierce, or the trustee of Joseph Pierce, were entitled to this money during the life of Joseph; and if the latter, to how much he was entitled. The cause was decided in the court below on a single point, and the argument here was

[Pierce v. M'Keehan.]

principally directed to that, though other matters were also mentioned, and discussed incidentally.

It was not seriously contended that Andrew was not a trustee for Joseph, and liable to be cited and proceeded against in court as such. The case in 3 *Vez. Jr.* 7, is express that Joseph could file a bill in such a case, and have relief by security, or seizure of the trust property. " The words," says the Chancellor, " are sufficient to raise a trust; for we have now got beyond all possibility of doubt as to the rule, that all words of recommendation or desire, by a person having power to command, shall operate as a trust. The only question is, whether the person in whose favour it is made, and the property to which it applies, are certain; and if so, all those words used by a person having power to command shall create a trust." If a bare desire or request that Andrew should support Joseph, would have made the former a trustee, much more shall a bequest, subject to his maintenance, make him such. The chancellor, in that case, goes on to say, the person to be supported or maintained may file a bill. See also the cases referred to in 1 *Powell on Devises*, 355 and 2 *Sch. & Lef.* 189.

The cause was argued principally on other grounds: that it was personal property; then became money; then invested in a tract of land, and new bonds given for the price of that tract of land. The cases last cited, show that a trust may be connected with a bequest of personal property; and it is too plain to reason on, that the trustee changing personal estate to money, leaves him as much a trustee as before the change. I speak particularly of such a trust as the one in question; viz. a bequest of a large amount of money, debts, and goods, subject to the maintenance of his brother. The remark that money has no earmark, like most quaint phrases, has obtained, or rather had obtained, a currency, and produced an effect greater than was intended when first judicially used. As a circulating medium, when passed fairly from hand to hand, it cannot be identified, nor, in most cases, followed and recovered from the innocent holder; but it never was intended to convey the idea that a trustee could devest himself of the fiduciary character, by converting trust money into goods or land; and in England, and here, when changed into stocks or lands, chancery has, and always will follow it. The proof here was full, and on argument, it was not contested that the land was purchased with this trust money; and Joseph for many years was maintained by the rent of this very land, or his maintenance was a part of the rent. I did not understand it to be seriously contested that the land was not subject to the trust, while Andrew owned it; but the land has been sold, and bonds taken for the price, and, it is alleged, passed by the general assignment. It is not necessary to say, that if the assignees had collected this money, and paid it away to Andrew's creditors, it would have presented a very different case; but they have not collected it. If the trust money was in the land, it must

be in the bonds given for that land; and the amount of the bonds is understood to be ready awaiting the event of this suit. A bankrupt, or insolvent debtor, assigns all his property of every kind; but his assignment does not pass what is not his, but another person's property. *Lewin on Trusts and Trustees*, 254, 5, 6. This is equally the case at law and equity; and where the trust property has been converted to property of a different description, the new acquisition will be equally protected from the effects of bankruptcy or insolvency. See *Ib.* and *Willis* 404; 3 *P. Wms.* 186, 7; 3 *M. & S.* 574, 5. In the last case, it was decided to make no difference that a trustee was guilty of a breach of trust in assigning it. A trustee can acquire no right to himself, or those in privity with him, by a breach of trust; and here his assignees have notice before receiving the money. It is much like the common case of a factor having absolute power of disposing of property in any manner he pleases, and he sells the property of his principal, and takes notes for the price; those notes do not pass the right to his assignees; and if assignees receive the money on them, the principal can recover that money from them.

In the hurry of a trial, it seems the learned court did not see that there was no mingling of, or confusion of property, in the sense supposed. Joseph had no right to any specific part of this bequest. The testatrix gave it all to Andrew; and it seems it consisted of goods, and debts, and money; but she gave it all, subject to the maintenance of Joseph, during his life; subject only to this, it was the property of Andrew, and all of it his property. Joseph had no right to any specific part of it — never had such right; there could then be no mingling of Joseph's money with that of Andrew; and I have shown that converting it into property of a different character, did not free it from the trust. 2 *Penn. Rep.* 346.

It was not denied that the extension of the equity powers of our courts over cases of trusts, brought this within their cognizance, under their extended powers on this subject. A chancellor would at once refer it to a master, to report how much of the fund should be sequestered from a failing trustee, to meet the provision of a maintenance to Joseph, during his life. We have no masters in chancery; it is to be regretted that the Acts giving equity powers to our common law courts, did not, at least, give a general outline of the forms by which these powers were to be exercised. The want of something in the laws, and of decisions or rules as to the mode of proceeding, led the counsel in this case to adopt this suit to ascertain whether the plaintiff below, or the trustee of Joseph, is to receive the money; and if the latter, how much he is to receive — how much, can in the present state of the law and practice, be ascertained, either by consent of parties or by a jury. This would be within the scope of the ordinary duty

[Pierce v. M'Keehan.]

of a jury; who, in a great proportion of cases, are required to decide who is to recover, and how much is to be recovered, if any.

Judgment reversed, and *venire de novo* awarded.