## LUDWIG et al. *v.* HIGHLEY et al.

A., the holder of the registered legal title to land in trust for B., who had paid the purchase-money, by deed dated April 1, 1842, recorded in the following January, conveyed the legal title to B. On the 28th of June, 1842, A. made a general assignment for creditors, who should within three months execute an agreement to release their debts on receiving their share of the assigned estate. The creditors sealed the agreement to release. The trust estate does not pass by the assignment, although A. exercised acts of ownership, and the creditors had no notice of the trust at the execution of their agreement.

A sealed agreement to execute a release, does not operate as a present release, so as to make the parties to that deed purchasers to the extent of their released demands. Such an agreement or a release, executed in pursuance thereof, would not bind the parties, if obtained by the fraud of the releasee.

The rule which estops a party, permitting the apparent ownership of property to remain in another, from setting up title against those who have given a personal credit upon the faith of such apparent ownership, is confined to chattels, and in the absence of actual fraud, does not extend to realty.

IN error from the Common Pleas of Montgomery county.

*March* 30, 31. This was an ejectment for certain property known as "the Gulf Mill." The plaintiff showed a sheriff's sale in April, 1833, to James Wells, for $2,600; a deed in December following, from Wells to Jacob Freedley, acknowledged May 1, 1834, and recorded April 11, the consideration named being $7,500; and a conveyance by Jacob Freedley and wife to the

plaintiffs, on the 28th June, 1842. This deed was an indenture between Freedley et ux., and D. Wood et ux., of the first and second parts, reciting proceedings in bankruptcy against the said Freedley and Wood, partners, and their desire to deliver up all their property to trustees, to be distributed as provided for in the Bankrupt law, to save trouble and expense, whereby the said parties, of the first and second parts, granted, &c., to plaintiffs " all their individual estate, real, personal, and mixed, and all debts, rights, and credits, (excepting articles exempted from execution not exceeding in value $300,) in trust to sell," and to apply the proceeds of the separate property to the separate debts, and the joint property to the joint debts; the residue of the partners' separate estates were to be applied to the joint debts, " agreeably to the spirit of sect. 14 of the Bankrupt law." Provided that no creditor should be entitled to a dividend who did not present his claim within three months, and " execute an agreement covenanting to deliver a full and absolute release to the said parties of the first and second parts, on his or their receiving his or their share of the estate hereby assigned."

On the 15th June, the proceedings in bankruptcy were discontinued by the creditors withdrawing their petition.

The plaintiffs then proved the execution of the agreement to release, by certain of the creditors; the exact time was not known, but it appeared to have been in some instances shortly after its date, which was July 12, 1842. This agreement was an indenture between plaintiffs, " being two of the creditors of Freedley and Wood, and executing the deed for themselves and all other creditors who have hereunto set their hands and seals;" and the said Jacob Freedley and D. Wood, reciting the assignment above-mentioned, and the covenant on the part of the plaintiffs and other creditors of Freedley and Wood, to comply with the proviso therein contained, in order to entitle them to a dividend, and covenanting by plaintiffs in their own behalf, and on behalf of all the other subscribing creditors, " that they and each of them shall and will, on his or their receiving his or their share of the estate so as aforesaid assigned, duly seal and execute unto them, the said Jacob Freedley and D. Wood, a full and absolute release of all actions, accounts, claims, debts, &c., up to the day of such release. This was sealed by forty-one individuals or firms. The plaintiffs further showed an inventory of the assigned estate, made by appraisers on petition of the assignees. In this, the property in question was enumerated and valued at $8,000; Jacob Freedley's debts were also stated at $48,347, and Freedley & Wood's at $10,910. This was filed

M

July 5, before the execution of the release, but there was nothing connecting defendant with it.

The defendant, John Freedley, had been admitted as landlord: his title was a deed by James Wells, dated April 8, 1833, but not recorded, reciting the purchase by him at the sheriff's sale for $2,600, for the use and at the instance of John Freedley; and that John Freedley had that day paid him the said amount, and instructed him to take the title in his own name, and declaring the trust for John Freedley, and covenanting to convey on request. Wells proved the purchase by himself at John Freedley's instance; that Freedley had paid the purchase-money to him, and that this deed was executed and delivered about the day of its date.    He further proved that he executed the conveyance to Jacob Freedley, (part of plaintiffs' title,) at the request of John Freedley, and that the consideration there mentioned was nominal.

The defendant then gave in evidence a deed poll, dated April 1, acknowledged May 27, 1842, and recorded January 9, 1843, by Jacob Freedley and wife, reciting the purchase by John Freedley, the payment of the purchase-money by him, and the taking of the legal estate, in trust for him, and conveying the property in dispute to John Freedley, in fee.

The defendant further gave evidence of notice to the assignees before the appraisement was made, that Jacob Freedley had no title to this property, and also proved he had always accounted for the rents, and made leases under directions from John.    The plaintiffs gave evidence of acts of ownership by Jacob, and offered to show his indebtedness; alleging that these credits were obtained on the faith of the ownership of the property.  But one point, however, was raised in this cause, under the instructions of BURNSIDE, J., (then President Judge of the district,) that, if the jury found Jacob to have been but a trustee for John, who paid the purchase-money, and to whom the rents were accounted for, then this estate did not pass under the general words in the assignment, though there was the agreement to release, (which, for the purposes of the cause, was to be treated as a release,) and the recording acts had nothing to do with it.  Nor would John's title be affected by his having permitted Jacob to manage it, lease, &c., thereby acquiring a false credit. That rule prevailed in regard to chattels personal, but not to real property.

The cause was argued at a former term, and now by

*Mallery*, for plaintiff in error.—The creditors, under this state of facts, ceased being creditors, and became purchasers.    There

are a series of cases fully establishing the doctrine, and going further than is required for our purpose; Pearpont *v.* Graham, 4 Wash. 232; Dey *v.* Dunham, 2 Johns. Ch. Rep. 182; Bayley *v.* Greenleaf, 7 Wheat. 46; Mitford *v.* Mitford, 9 Ves. 100. This court has not gone to the extent of treating the assignees of creditors as purchasers: the point was left open in Petrie *v.* Clark, 11 Serg. & Rawle, 377, but where the creditor himself has parted with value, he has converted himself from a creditor into a purchaser for value, by the release or extinguishment of the debt; Hartman *v.* Dowdel, 1 Rawle, 279; Twelves *v.* Williams, 3 Whart. 485; Knowles *v.* Lord, 4 Whart. 500, in which there is nothing to authorize the second marginal note. Here were creditors bargaining with the assignors, and receiving the assigned property in satisfaction, for it was conceded the covenant to release was equivalent to a release. Having thus ceased to be creditors, they have become something, and what are they unless purchasers, for it cannot be that a man may not convey in satisfaction? They are, moreover, apart from the doctrine of purchase, not affected by the unregistered conveyance; Wither's Appeal, 14 Serg. & Rawle, 185; Bellas *v.* McCarty, 10 Watts, 13. The court rejected all evidence of credit given to Freedley on account of the apparent ownership of the property, and the permission to act as owner equivalent to giving a credit by the real owner.

*Meredith*, contrà.—The law would presume the credit was given within the last nine years, hence the whole case resolves itself into two questions—Whether the land passed by the assignment, and if so, the right of John Freedley as a creditor. This is a general assignment, without schedule or description to ascertain what was passed thereby. The assignor had neither the legal nor the equitable title thereof. There being then neither a specific consideration or description, it is said, the law says he undertook to pass what he did not own, contrary to the fundamental rule that, where words have an ambiguous meaning, the construction is always according to law and right, and not to work injustice and wrong; Co. Litt. 42 a. But here the words are not ambiguous. There is a latent ambiguity to be resolved by the inquiry, what did the owner have that he could pass? The recording acts are out of the case, for if the legal title had never been conveyed, the law would have construed the deed as not conveying a naked legal title; Touch. 87; Lewin on Trus. 245, and cases there cited. In the case of a will, the mere charge of debts is sufficient to rebut the presumption. 8 Ves. 436; Reade *v.* Reade, 8 Term Rep. 118. [GIBSON, C. J.—

Have you any cases on deeds ?]   I never have known a case raised against this construction.   In Mitford v. Mitford, 9 Ves. 97, the Master of the Rolls takes the distinction between a general assignment, a charge, and a specific assignment for a specific consideration.   Under the Bankrupt law and Insolvent law, such an interest would not pass, and yet the statutes require all the estate to pass. The reason is, that a fraudulent construction will not be forced on the statute.   [*Per Curiam*.—That is a construction of a statute.] True, but there is no distinction, in this respect, between the deed and the statute—the *intention* is the point.   It is so under the English and American insolvent laws, where there is a general voluntary conveyance.   In Seal v. Duffy, 4 Barr, 274, it is said that a voluntary assignee may not avail himself of the want of a registry.   Suppose the conveyance recited the trust, it would not pass. [ROGERS, J.—So far as mere creditors are concerned, that is so ; but if third persons paying value, as here, come in on the faith of the *recorded* deed, can the trust be set up against them ?]   Certainly not.   [ROGERS, J.—What is the difference, if creditors become purchasers ?]   They claim under the grant, and if there was no intention to pass the property, and no fraud on the creditors, which is assumed here, it will not pass any more than under an ordinary sale of all the grantor's estate, which would not pass trust property, unless it could be shown *dehors* the deed that the grantor held out that he was conveying, and the grantee supposed he was purchasing the particular property.   Here the uncontradicted testimony was, that the list presented to the creditors did not contain this property.  [ROGERS, J.—All that was taken from the jury.   The question is the construction of the deed, or on whom does the *onus* lie to show the general words were not supposed to include all the property that appeared to be the assignor's.]   A trust has been shown, and the property was not included in the schedule.   It will be the first time the law compels a man to commit a fraud by a construction put upon his lawful acts.

Supposing they were *bonâ fide* purchasers of the specific property, then notice before payment is sufficient ; Union Canal v. Young, 1 Whart. 410.   But are they purchasers ?   There is no question as to a general assignee.   The fact of a release is immaterial ; Seaving v. Brinkerhoff, 5 Johns. Ch. Rep. 329 ; Knowles v. Lord, 4 Whart. 500, where there were releases ; Pierce v. McKeehan, 3 Watts & Serg. 280.   Here, however, there has been no release executed, but a covenant to do so on receipt of the property. There is then this dilemma—if they agreed to release on receiving

this, they are not bound to do so unless they do receive it; and if they agreed to release, although they did not acquire this property, then they cannot be said to have paid value for it.

*Reply.*—General words in a private conveyance are sufficient to pass the whole estate; 4 Cow. 432; 13 Johns. 537; 10 Pick. 376; 4 Bibb, 288; Lewin on Trusts, 245–6. On the recording acts; Poth *v.* Anstatt, 4 Watts & Serg. 307. The covenant here amounted to a release; 9 Barn. & Cress. 300.

*April* 17. BELL, J.—Notwithstanding the numerous errors assigned in this record, there are, in reality, but two questions of any moment involved in the case. The first of these is, whether, under the facts given in evidence, any beneficial interest in the premises in question passed to the plaintiffs, as the representatives of creditors, by virtue of the deed of assignment of 12th July, 1842? It was in clear and uncontradicted proof on the trial, and so found by the jury, that although, up to the 1st of April, or, possibly, the 27th of May, 1842, the legal estate in the land and messuages known as the Gulf Mills, was vested in Jacob Freedley, the assignor, by virtue of the deed from James Wells to him, yet the beneficial interest always resided, by way of resulting trust, in John Freedley, at whose instance, and for whose benefit, Wells purchased the land at sheriff's sale. It is put beyond controversy, that Jacob Freedley, up to the moment of the delivery of his deed of release to John, was, as Wells had been before him, a naked trustee, holding the legal title as a mere depository for the use of his brother, and that he managed the property solely for the benefit of that brother. On one of the days just mentioned, and in the view I have taken of this case, it is immaterial which, Jacob, upon the request of John, divested himself of the legal title by a conveyance duly executed to John, in whom the legal and beneficial interest thus became united. As there is no allegation of actual fraud attaching upon this transaction, and as it took place nearly two months prior to the execution of the deed of assignment under which the plaintiffs claim, it would seem to result, necessarily, that Jacob, the assignor, had no interest of any kind in the premises, which, by any possibility, would pass to his assignees by virtue of the assignment. As between the immediate parties to the deed, such was, incontrovertibly, the case. The assignees, being mere volunteers, are regarded but as the agents of the assignor, standing in his place, and consequently, as a general rule, take only such rights and interests as he himself had and could claim, at the time of the assignment made:

Mitchell *v.* Winslow, 6 Chand. Law Rep. 347; 2 Story's Eq. sec. 1411; Pierce *v.* McKeehan, 3 Watts & Serg. 283, 284; Luckenbach *v.* Brickenstein, 5 Watts & Serg. 149; *In re* Wilson's Accounts, 4 Barr, 430. Such a voluntary assignment by a debtor is, in this respect, like the assignment of a bankrupt or insolvent, which passes nothing more than they possessed or enjoyed, and under which the assignee takes their rights, precisely in the same plight and condition as they themselves respectively had them; Mitford *v.* Mitford, 9 Ves. 100; Worrall *v.* Marlar, 1 P. Wms. 459, in *notes;* Like *v.* Beresford, 3 Ves. 506. Nor would the assignment in hand, in the absence of any superadded act upon the part of the creditors, have operated, beyond this, to pass a beneficial estate, had the deed of release from Jacob to John Freedley never been made, for the assignees, at most, would have taken the legal estate in the land, burdened with the equity to which it was subject in the hands of the assignor; Twelves *v.* Williams, 3 Whart. 485; Wolf *v.* Eichelberger, 2 Penna. Rep. 346; Knowles *v.* Lord, 4 Whart. 500; Vandyke *v.* Christ, 7 Watts & Serg. 373. It would be thus a barren acquisition, productive of no fruits, for Jacob Freedley never had any such estate or interest in the property in controversy, as by the mere exertion of his will could be made beneficially available to his creditors, by a conveyance. To have attempted this, whether before or after the making of his deed of release to John, would have been such a fraud in him as the law will not, gratuitously, impute to any one. It is difficult, therefore, to perceive upon what principle his deed of assignment shall be made to operate a conveyance of that which was not his, without the slightest manifestation of an intention, on his part, that it should have this effect, so far as intention is to be gathered from the face of the deed itself. But his creditors claim superior to his intention. Speaking through the plaintiffs, they assume to have placed themselves in the position of *bona fide* purchasers for a valuable consideration, in relation to the land in contest, without notice of the secret trust, or of the deed of release from the trustee to the *cestui que trust*, which was not put on record within six months after its execution, nor until long after the execution and delivery of the deed of assignment. In this character, they insist they are entitled to stand unaffected by the latent equities which existed between Jacob and John Freedley, and are protected against the legal operation of the deed from the former to the latter, by the recording act of 1775. A short examination of these pretensions will, I think, show them to be unfounded. The creditors rest their claim to be considered and treated as purchasers

for value, and so entitled to every protection which equity and the law affords to such a purchaser, on the ground, that before notice of John Freedley's interest in the particular tract of land, they had acceded to the assignment by an acceptance of its conditions and terms, manifested by a release of the debts due from the assignors to them, respectively. That such releases will turn creditors into purchasers seems to be denied by Sergeant, J., in Knowles *v.* Lord, though a different opinion is incidentally expressed by Rogers, J., *In re* Wilson's Accounts. Many intimations have been thrown out by different judges upon this point, but I believe it has never been expressly ruled in this state, in reference to a general and voluntary assignment for the benefit of creditors, like the present. But if it be conceded that an acceptance of the conditions of such an assignment by creditors, shown by an unqualified release of the debts severally due to them, entitles them to stand as purchasers in respect to the estates and things assigned for their benefit, and which constitute the moving consideration for the release, how can it be said to work this effect in respect to things which clearly were not comprehended by the terms of the assignment? It has been shown, I think satisfactorily, that the Gulf Mills did not, immediately on the execution of the assignment, pass to the assignees, simply because it was not a part of the assignor's estate, real, personal, or mixed. But it is said that, as it appeared from record evidence, and a possession apparently consistent with it, that the debtor had the beneficial and legal interest in the land, at the time of his assignment, which was not divested by any conveyance of which his creditors had notice, it was competent to them to consider it as still residing in him, and to act upon the assumption of its being a part of his estate, subject to the terms of the deed of assignment. If this be admitted, I do not think it adds any strength to the claim of the plaintiffs. The only action the creditors have exerted, in reference to the assignment, is to be found in their covenant to execute releases, at a future day. Now one of two propositions, upon the subject of this covenant, must be true; namely, that at the time they entered into it, they either had or they had not in contemplation, as a part of the fund assigned for their benefit, the premises so often mentioned. If it was not so in their contemplation, then it formed no part of the consideration from which their covenant sprang. Giving the principle they invoke, the most liberal extension in their favour, it goes no further than this, that in order to vest them with an equity, as purchasers, superior to the title of the true, though secret owner, it must be

shown that they purchased the land, claimed as passing by the equitable force of the assignment, by some sacrifice made, or advantage relinquished, in direct and intelligent reference to it. That this is so, is fully shown by the reasoning of this court in the Petrie v. Clark, 11 Serg. & Rawle, 377; Hartman v. Dowdel, 1 Rawle, 279; and Twelves v. Williams. The utmost that can be said is said in the case last cited, "that the extinguishment of a debt is a valuable consideration for a thing taken in satisfaction of it." But how can that be said to be taken in satisfaction of an extinguished debt, of which the creditor did not suspect the existence at the time he consented to the extinguishment, and which did not, in fact, belong to his debtor? Regarding the transaction in this aspect, the argument may be thus stated. We, say the plaintiffs, as the representatives of the creditors, looking to the assignment, and without knowing the particulars of which the property of Jacob Freedley was composed, became the purchasers of all his estate, real, personal, and mixed, by agreeing to release our debts upon recovering the avails of that estate. Very well, answer the defendants, you are entitled to all the assignor's estate, of every description that will pass by general words, but the land you now seek to recover formed no part of his estate, at the time of the execution of the deed of assignment, and having relinquished nothing because of it, of course you cannot claim to have it by force of that conveyance. You do not stand in relation to it as would a purchaser without notice, by specific description, and for a specific consideration.

But take the other proposition to be correct, that, misled by the recorded deed from Wells to Jacob Freedley, and his possession under it, the creditors acted upon the belief that the premises in dispute belonged to their debtor, and were thus induced to enter into the covenant stipulating for a release. In that case it is plain there is a failure of consideration to the full value of the land, which would avoid the releases, at least *pro tanto*, had such been executed with an observance of every legal form. In this view of it, the position of the creditors is not that of an innocent purchaser, who has taken a conveyance and paid his money. Their attitude is that of one who has received notice of a latent equity, affecting the estate purchased, before parting with the purchase-money, and notice before payment of the consideration is sufficient to defeat the equity of the purchaser, for a court of chancery will relieve him against the payment; Union Canal Co. v. Young, 1 Whart. 431; Lewis v. Bradford, 10 Watts, 67, 82. In this instance, if there has been a failure of consideration, the creditors have done nothing that

may not be recalled, or rather the law, coming to their aid, discharges them from the obligation of their contract, at the very least, to the extent of the failure.  If there has been a fraudulent representation by the assignor, or even a studied silence, by which the creditors have been deceived, their covenant may be avoided altogether.  Whether, then, they acted or did not act, upon the supposition that the land sought to be recovered was of the estate of Jacob Freedley, is wholly indifferent, so far as the object of this action is involved.  Upon either supposition they are without merits as against the true owner.

The case has, hitherto, been considered as if releases were actually executed.  But what has been said acquires additional force when applied to the fact that each of these creditors has gone no further than to contract for the extinguishment of his claim when his proportion of the avails of the assigned property shall be paid to him. Being executory, and resting in contingency, it is of no value until the precedent condition be performed, which is to clothe it with a binding effect.

But the plaintiffs further aver, that the debts due to the creditors were contracted by the assignors, whilst Jacob Freedley was the ostensible owner of these premises, and, by the sufferance of John, in the actual possession and occupancy of them, whereby he was placed in a position to deceive the world, and thus acquire a false credit.  Admitting this to be so, the second question presented is, whether, in the absence of an actual fraudulent design entertained by the brothers, the possession of Jacob confers upon his creditors a beneficial interest, which otherwise they would not have taken under the assignment?  The principle which forbids the divorce of the real ownership, and the actual possession of personal chattels, has never been extended to corporeal hereditaments.  That principle rests on the impolicy of permitting collusive transfers of the legal ownership, which would put the property beyond the reach of the debtor's creditors, rather than on the ground that a false credit is given by a retention of possession.  But this species of legal fraud, which may vitiate a real transaction, is, in its operation, strictly confined to the case of a sale or pledge of chattels. · For obvious reasons, it would produce the most mischievous consequences to apply it to the possession of lands.  The most usual mode by which real property is enjoyed, is by permitting others to occupy it, and it has never been thought, in the absence of actual fraud, that so far as third persons are concerned, it makes any difference whether the occupancy be by virtue of a demise for years, or under an ab

solute conveyance, coupled with a secret, *bona fide* trust. To hold otherwise would be materially to interfere with, in a great variety of cases, this species of equitable estate, which our laws distinctly recognise. Our books furnish numerous instances in which the possession of trust property remained in the trustee, and yet, until now, it has never been claimed that such possession subjected the land to the burden of his debts. In the case of personal chattels, possession is said to be the only *indicia* of ownership to a stranger, but this cannot be said of hereditaments. In short, the reasoning applicable to one species of property is wholly inapplicable to the other, and *cessante ratione legis, cessat ipsa lex.* To introduce a new rule of property, without some stringent reason calling for it, would be utterly unjustifiable. We perceive, therefore, no error in the refusal of the court below to instruct the jury, as requested by the plaintiff, on this point.

The settlement of these two questions covers the whole case, and, without entering upon a particular examination of the charge of the court below, justifies the conclusions at which it arrived. There is nothing in the remaining errors assigned calling for special notice. Indeed, these were not urged on the argument.

Judgment affirmed.

Burnside, J., was absent during the argument of this case.