## Foster *against* M'Divit.

9 w 341
135. 373

An actual possession, or a constructive possession which results from a purchase at treasurer's sale and a subsequent payment of the taxes, is such a title as will enable a plaintiff to recover in ejectment against one who has entered upon the land without right.

In an ejectment against one who entered upon the land by fraud or force, it is only necessary to enable the plaintiff to recover that he shows the title to be out of the commonwealth, and that he had the actual possession; but the manner or means by which the defendant obtained the possession will not preclude him from a defence founded upon a good title.

*Quære?* Whether a verdict and judgment in an action of trespass, on a traverse of *liberum tenementum*, be not conclusive of the title in ejectment.

ERROR to the common pleas of *Huntingdon* county.

This was an action of ejectment for 140 acres of land, by William Foster against William M'Divit.

The facts which gave rise to the only questions of law which were determined are sufficiently stated in the opinion of the court.

*Huling* and *Wallace*, for plaintiff in error, cited 3 *Watts* 69, 70.

*Fisher* and *Miles*, for defendant in error.

There seems to be a misapprehension in this case, as to the nature of any possession the plaintiff could pretend to have ever had of the tract of land for which the ejectment was brought. It seems to be supposed, that if he was in the actual possession at any time, of the little field, by a tenant, he was in possession of the whole tract. Now this is conceived not to be warranted by the evidence. There is nothing in it to show that either Livingston or Stewart's possession or tenantcy extended one inch beyond the limits of the little field. It was the field that was leased, and not the tract of land within the limits of which it was situated. If the tract had been leased, then there might be some reason to say that the actual possession of a part was the possession of the whole. But here, where there was no pretence of a possession in the tenant for more than the field, could Huling be considered to be in possession under his colourable title of the balance of the Long tract? If he could, then his colourable or void title must be considered as having the incidents of a legal title. Huling or Wilson, under whom he claimed,

[Foster v. M'Divit.]

had no possession but by Livingston or Stewart. If he had a more extended possession than they had, it must be by construction such as results from title. Seisin and possession continue in the owner until he is disseised, and no further is the possession lost than of that which he is actually disseised. Miller *v.* Shaw, 7 *Serg. & Rawle* 142. The rightful owner, in presumption of law, is in the constant possession, until that possession is adversely interrupted and exclusively possessed by another. Here the possession of the tenant is confined to a field, and it is attempted to extend that possession in favour of the landlord, claiming under a void title, so as to disseise the owner of the woodland. Possession by operation of law accompanies the title unless the contrary is shown, and until it is shown. 6 *Serg. & Rawle* 23. Every owner is in possession until some person actually enters on him under an adverse claim, and the statute of limitations begins to run from the time actual adverse possession is taken only. 1 *Penn. Rep.* 6. It results from these principles, that the owner of the legal title, under the Joseph Long warrant, was in the constructive possession of all of which he was not disseised. He was not disseised of more than the field by the possession of Livingston and Stewart, because they had no pretence of possession beyond the limits of the field. And this does not militate against the principle, that a person having a defective title, and entering under that title, will be considered to be in possession to the extent of his claim; for here there can be no pretence of a possession beyond the part leased. Then was there even a naked possession of more than the field at any time? But M'Divit, the defendant in this case, brought an action of trespass *quare clausum fregit* against Foster, the plaintiff, No. 36, April term 1830, for cutting timber on the land in dispute; a plea of *liberum tenementum* was put in, and on a trial on this plea M'Divit obtained a verdict. This was at least *prima facie* evidence of title in him, and certainly evidence of possession. Indeed it is made a grave question in the case of Kerr *v.* Chess, 7 *Watts* 371, whether a verdict and judgment on a traverse of *liberum tenementum* is not conclusive of the title in ejectment. His honour, the chief justice, in that case says the question is unsettled. 7 *Watts* 371. This then ought to settle the matter as it regards the plaintiff's right in this case to recover from the defendant on a naked possession.

Can there, however, be any recovery in an ejectment on a naked possession, when there is neither fraud nor force made use of to deprive the plaintiff of that possession? It is confidently asserted there cannot, upon the authority of the cases of the Executors of Espy *v.* Lane, 2 *Serg. & Rawle* 57, and Griffiths *v.* Dobson, 3 *Penn. Rep.* 228.

But if there could, it would be wrong to reverse the judgment in this case, because it was distinctly admitted on the trial in the court below, by the plaintiff's counsel, that unless he had shown that he, or those under whom he claimed, had been in possession for twenty-

one years under the sale, he was not entitled to a verdict.  If then the charge is not accurate as it regards a mere naked possession, constituting a sufficient foundation on which to recover against a trespasser without colour of right, it is the fault of the plaintiff's counsel, and the judgment would not be reversed for an error which the counsel was instrumental in leading the court into.  The cause was argued on both sides on the ground of twenty-one years possession being required to enable the plaintiff to recover.  It would, therefore, not be treating the court fairly to reverse the judgment.  Nor was the naked point presented for the considera- tion and answer of the court.  It is urged that the 12th point put to the court, proposed the distinct question.  The question raised in that point is, whether if A. Green, or those holding his title, had ever been in actual possession of the tract, or of any part of it, and that title was vested in the plaintiff, he was not entitled to recover, notwithstanding an adverse possession held by John Fee of a fraction of the tract for several years subsequent to the time A. Green had possession of the whole?  The question as to the effect of an actual possession in the plaintiff, at the time of the entry of the defendant, was not distinctly raised by the point proposed.  And the answer given is to be taken in connection with the concession made through- out the trial by the plaintiff's counsel, that unless the plaintiff and those under whom he claimed had proved a possession of twenty- one years, he could not recover.  We do, therefore, think there is no reason for reversing the judgment and continuing the litigation between these parties.

The opinion of the court was delivered by

ROGERS, J.—The plaintiff claims title by virtue of several con- veyances from Aquila and Charles Green.  The original warrant for 150 acres, was issued to Joseph Long, under whom both parties claim.    The 29th of October 1793, 100 acres, part of the tract, sur- veyed in the Long warrant, was sold for taxes; and a deed was made to John Patten, by the commissioner of Huntingdon county; and on the 16th of February 1803, Patten conveyed to Charles Green.  The 7th of February 1806, the remainder of the tract, about 48 acres was also sold for taxes, and was conveyed to Aquila Green.  Afterwards, Aquila Green and Charles Green, conveyed the whole interest in the Long warrant and survey to Thomas Wilson; Wilson conveyed to Huling, and Huling to the plaintiff. Charles Green and Aquila Green took possession of the property, exercised acts of ownership over it, by residence and otherwise; and Aquila Green built a house on what he supposed at the time, and continues to believe, was a part of the property.  Wilson was in possession after his purchase, and it was proved by him, that he paid the taxes for twenty years.  It also appears, that John Liv- ingston, at the instance, and by the permission of Thomas Wilson, cleared and cultivated a little field within the lines of the survey,

of about two acres, and that Alexander Stewart took possession and raised wheat and rye on it. This took place before the purchase of Huling. After Huling purchased from Wilson, Livingston took possession under him. M'Divit, the defendant, as the witness Livingston expresses it, discharged him, and Livingston acknowledged M'Divit as his landlord, by giving him a share of the crop. That Huling was in possession at the time of M'Divit's entry, is also proved by William Reed; for Reed, who was a surveyor, and the purchaser when the tract was last sold for taxes, and under whom the defendants claim, resurveyed and divided the land between Livingston and Foster, to whom Huling had sold it in parcels. Reed was well acquainted with the situation of the tract at the time of his purchase, and there is evidence from which the jury might infer, that Foster was aware of it also.

The court charged the jury, " That inasmuch, as the property was sold previous to the act of 1815, for taxes, and the plaintiff had not shown, nor pretended to show, a literal compliance with the directions of the acts, under which the property was sold, he was not entitled to recover, unless he proved, that he, and those under whom he claimed, had been in the continued and uninterrupted possession for twenty-one years. The court say, " That they (the jury) must observe, that the plaintiff must recover by the strength of his own title, and not the weakness of the defendant's. It is admitted the sales in 1793 and 1801 gave no title, except the right of entry; which, if it was continued for twenty-one years, gave title. If you (the jury) cannot find, that the purchasers in 1793 and 1801, and those claiming under them, had a continued and actual possession, the plaintiff is not entitled to recover, and you need not trouble yourselves about the defendant's title." The court thereby instruct the jury, in effect, that unless the plaintiff, and those under whom he claims, had such a possession as would give title, by the act of limitations, he must fail in his action, without regard to the entry of the defendant, whether by right or by wrong, whether he had or had not a title to the land. It is only necessary to state the proposition, to be convinced, that in this direction, the court was in error.

Previous to the act of 1815, as has been correctly said, it was repeatedly held, that to rest a title in the purchaser of lands sold for taxes, an exact and minute adherence to the directions of the laws is necessary. It must appear, that every direction and requisite of the acts has been judicially complied with. 2 *Yeates* 101, 312; 3 *Yeates* 284. But this rigid principle is only true, as between the purchaser at the tax sale, and the person who is the owner of the land, and those claiming under him. It cannot be intended to protect an intruder, or trespasser, for as against a person who enters without right, an actual possession, or such a constructive possession, as a purchaser at a tax sale obtains, is all that the law requires. All that is requisite in a plaintiff in eject-

[Foster v. M'Divit.]

ment, in the first instance, after showing title out of the common-
wealth, as against an intruder, is to prove an actual possession, or
where the land is sold for taxes, to exhibit the deed from the com-
missioners or treasurer. This is such a *prima facie* title, as is
sufficient to put the defendant on proof of a better right. The ac-
tion of ejectment is intended to try the right to the possession, and
from this it follows, that an actual possession, or a constructive pos-
session, which results from a purchase at a treasurer's sale, and the
subsequent payment of the county rates, is good, against a person
who enters without right. It is an elementary principle, that the
possession of property, whether real or personal, gives title, except
as against the right owner, and in all cases, the court will restore the
possession, whenever it is unlawfully invaded. A plaintiff must
recover by the strength of his own title, but this principle is not
alone applicable to real estate; it is equally true in regard to per-
sonal property. And whatever right a party may have, whether
it be a possession or a fee, it is within the protection of the law.
And for our authority for this, if it needs one, I refer to the case of
the Executors of Espy v. Lane, 2 *Serg. & Rawle* 57, where it is
ruled, that a naked possession is good title to recover in ejectment,
against one who puts another out of possession, and can show no
better title. In opposition to this plain principle, the defendant in
error, relies on Griffith v. Dobson, 3 *Penn. Rep.* 228. But that case
only decides, that although the defendant may have obtained the
possession by fraud or force, yet that circumstance did not preclude
him from insisting on a better right. That decision was intended to
correct a mistake into which Mr Justice Duncan had fallen, in Har-
ris v. Bell, 10 *Serg. & Rawle* 43. " Ejectment," says the judge,
" is a possessory action. The right of possession may be in one,
and the title to the property in another. One having the right of
possession, may recover in ejectment against him, who has the right
of title; *for if the plaintiff shows himself to have been in the
peaceable possession, and that he was forcibly dispossessed, it
will enable him to recover, and the defendant cannot set up title
in bar.*" For this, several authorities are cited, which, on exami-
nation, were found not to support the position. In Griffith v. Dob-
son, the court thought, that the manner the possession was acquired
by the defendant, whether by force or fraud, was immaterial. That
in all cases in ejectment, except as between landlord and tenant,
or some special case, the defendant may show title; and if it ap-
pears that he has the better right, he is entitled to a verdict. The
very object of an ejectment is, to determine the right to the pos-
session, and the exhibition of a superior title shows the right to be
in the defendant. When a person is in the peaceable possession of
land, and another turns him out by force, and he wishes to be re-
stored to his possession, and at the same time to avoid the trial of
the title, the law has given him an adequate remedy, under the
statutes of forcible entry. See act of 1700, against forcible entry,

IX.—2 E

[Foster *v.* M'Divit.]

*Purd.* 434.   Title cannot be given in evidence by the defendant, in an indictment for forcible entry to prevent restitution. 1 *Dall.* 68. All that was ruled in Griffith *v.* Dobson, was, that in ejectment, evidence that the defendant has title, was an answer to the plaintiff's claim, without regard to the manner of the entry, whether by force or fraud. The apparent contradiction in the cases, arises from not adverting to this distinction.   If the plaintiff shows a peaceable possession at the time of entry, it is a *prima facie* title, but this does not prevent proof of a better title in the defendant.   Instead therefore of directing the jury in the manner stated, the court should have informed them, that if, at the time of the entry of M'Divit, Huling, who claimed under the tax title, was in the actual or in the constructive possession of the tract, the plaintiff was entitled to recover, unless the claim was rebutted by a superior title in the defendant.   On another trial, it may also be well to inquire whether the defendant is in a better situation than Livingston, who would seem to have been the tenant of Huling; and whether the principle, that a person who comes into possession under a tenant, is in no better condition than the tenant himself, and cannot defend his possession against the landlord, does not apply.   Graham *v.* Man, 4 *Serg. & Rawle* 467.

It appears to have been proved that Wilson, who held the tax title, paid the taxes for twenty years.   In Reed *v.* Goodyear, 17 *Serg. & Rawle* 350, since recognised in M'Call *v.* Auly, 3 *Watts* 73, it is ruled: that when land, for which a warrant has issued, has been sold for taxes, and the warrant holder makes no claim for twenty-one years, and does not pay nor offer to pay the taxes accruing during that time, it may be left to a jury to presume an ouster or abandonment by him.   That case, at the time it was decided, was supposed by some to be a little in advance of the law, but subsequent reflection, and I may add the experience of the profession, has convinced the most sceptical that it is in accordance with sound policy.

It would be giving an unreasonable advantage to the owner to rule otherwise; for the owner will infallibly assert his claim or not, as the land rises or depreciates in value.   This the principle above asserted is calculated to prevent, or at least to bring it within some reasonable grounds.   If the jury then may presume an ouster, grant or abandonment, the silence of the former owner must enure to the benefit of the purchaser at the tax sale, however irregular that sale may be, provided he has added strength to his title, by payment of taxes subsequently assessed.   The application of these principles will render it necessary to inquire whether the ownership of the tax titles, together with the subsequent payment of the taxes, gives title to the plaintiff, or, at any rate, such a *prima facie* right as can only be met by countervailing proof.

These several views, in the opinion of this court, render an examination of the defendant's right necessary, and consequently the court were wrong in directing the jury that they need not trouble

[Foster v. M'Divit.]

themselves about the defendant's title. But if the court had charged correctly as to this point, there would have been little reason to quarrel with their subsequent direction. The charge seems to have been substantially against the defendant, on the ground that the evidence proved that it was a seated tract. The defendant placed his defence on two grounds: first, that the plaintiff could not recover, because he had not been in the continued and uninterrupted possession for twenty-one years; and, secondly, that admitting he was in by possession, the title was divested by the tax sale. The first point has been already disposed of in the foregoing remarks. To the second the plaintiff replied, that, at the time of the assessment, it was a seated tract, and that consequently the sale was void. Whether the tract was seated, was the pivot on which the whole case turned, and in this aspect it became important to show that the house, which was built, at an early day, by Aquilla Green, inhabited by him and by several of the tenants in succession, was situated on the Long survey. For if it was, there was an end of the defendant's title; inasmuch as all doubt was removed as to the disputed question, whether it was a seated tract. Aquilla Green swears, that when he built the house he had the line of the Mifflin survey run, in order that he might know that he was building on his own land. He ascertained, as he thought, that it was on the Long survey. Thomas Wilson purchased under the supposition that the house was within the survey. Now granting that, on a more accurate survey, it should be discovered, contrary to all reasonable calculation, that the house was on the Mifflin tract, or that it was situated on some other property belonging to the plaintiff, and was not within the limits of the Long survey, will that circumstance authorise the assessment of the tract as unseated? As this question may not arise, we refrain from intimating an opinion upon it, and merely throw it out as a point, not without difficulty, and which it would be well to investigate and decide, if it should fairly arise on another trial.

But however these facts may be, this was not the only evidence on which the plaintiff relied, in avoidance of the sale to Reed. Livingston testified, that he cleared about two acres of the land in dispute. He farmed it, took three crops off it, plastered it, put it in clover, and left it until the year 1818. Afterwards, Alexander Stewart took possession, put it in ryé in 1822 or 1823, and the next year raised a crop on it. This testimony is confirmed by Alexander Stewart. The little field, of which they speak, was on a different part of the survey. It is pretty clear that it does not give it the character of an unseated tract, and as such subject it to sale, because it is placed by the assessor on the unseated list, even if this be done without objection and with the knowledge of the owner. When a tract is seated, which may be either by cultivation or residence, as there is a want of jurisdiction in any person to sell, the sale is void; consent, at any rate, such as may be inferred

[Foster v. M'Divit.]

from silent acquiescence, cannot give jurisdiction. Where, however, the owner suffers it to remain on the unseated list, and pays taxes for it as such, it is some evidence that he considers it unseated, and, in a doubtful case, this may turn the scale. It is the duty of the assessor to make the assessment correctly, and his mistake ought not to prejudice the owner. The assessor has nothing to do with the misapprehension or mistakes of the occupant. It is sufficient that there is a personal responsibility for taxes, to make it his duty to assess the land as seated. Ressenberger v. Scholl, 7 *Watts* 390; Schaeffer v. M'Kabe, 2 *Watts* 422. When land once assumes the character of a seated tract, it remains so until it is apparent that, from neglect or other causes, it is so far dilapidated and permitted to fall into decay, as to have relapsed into a state of nature; and whether it has reached that stage, must be decided by the jury, under the direction of the court. Ressenberger v. Scholl, 3 *Watts* 390. The fact that the owner has ceased to reside on it, or has ceased to cultivate it, does not change its character. But if the owner has suffered it to relapse into its original state, the assessor would be at liberty to assess it as an unseated tract. And where it has been abandoned by the owner, but nevertheless continues to be occupied or cultivated by others, such a personal responsibility exists as exempts the property from sale. The land is assessed and sold, only because, otherwise, there would be no mode to enforce payment of the county rate. Whether a tract be seated or unseated, does not depend on the amount of the product of the land, nor on the quantity tilled, for whether it be more or less, as a personal responsibility is created, the land is exempted from sale. Kenney v. Daily, 6 *Watts* 269. The extent of Livingston and Stewart's possession is immaterial, for an entry on part of an entire tract renders the property of the occupant at least liable to distress. It can make no difference in the result that Livingston or Stewart's possession or tenancy extended only to the limits of the little field. Nor does it matter that it was the field that was leased, and not the tract of land within the limits of which it was situated. It is enough that there is a part of the tract a cultivated spot, to the produce of which the collector may look for the amount of the tax. With the actual owner the assessor has nothing to do, it being sufficient for his purpose that there is an occupant personally responsible for the public charge. Schaeffer v. M'Kabe, 2 *Watts* 422. In all the cases it is uniformly held, that it is the primary object of the legislature to charge the person and not the land, and the leaning of the courts has been to exempt real property from sale, when it assumes the character of a seated tract. In Fisk v. Brown, 5 *Watts* 441, it is ruled that the cultivation of several acres fixes the denomination of the whole tract, and charges the person of the cultivator so that the tract cannot be sold for taxes.

But it is said that it would be wrong to reverse the judgment, because it was distinctly admitted on the trial that, unless the plain-

[Foster v. M'Divit.]

tiff had shown that he or those under whom he claimed had been in the possession for twenty-one years, under the sale, he was not entitled to a verdict. This the plaintiff's counsel denies, although the allegation is undoubtedly supported by the charge. But however this may be, yet the point as to the possession arises, although somewhat obscurely, on the answer to the plaintiff's twelfth point. It is not the naked point, yet the question is involved in it, and at any rate, although the counsel may have inadvertently given away his client's cause by such an admission, the mistake is so vital that the due administration of justice, which is a paramount consideration, requires that the case should be re-examined.

As this cause goes down for another trial, we would recommend to the counsel to direct their attention to the effect of the verdict in the action of trespass, on the plea of *liberum tenementum.* In 7 *Watts* 371, and in some other cases, a doubt has been expressed, whether a verdict and judgment on a traverse of *liberum tenementum* is not conclusive of the title in ejectment. Although this point may, in another trial, have a material bearing, yet, as the case now stands, we do not think it right to rule that, as we have been requested, as it settles the matter as to the plaintiff's title to recover from the defendant, even on a naked possession.

Judgment reversed, and a *venire de novo* awarded.