DIKEMAN *v.* PARRISH.

A list of unseated land, and the assessments thereof for tax purposes, entered in books kept in and belonging to the office of the board of county commissioners; entries in the *day-book* of the commissioners, of the appointments of their clerks; a list in the handwriting of a clerk to the board of commissioners of the unseated lands of delinquents; and a list of original sales by the sheriff of unseated lands for taxes, when proved to have been official books and office-papers, by persons connected with the office and its records, are legal evidence; they being official books and papers, in which are recorded the transactions of the county commissioners as public functionaries, intrusted with the discharge of ·important duties, and, amongst others, *those which relate to the taxation and sale of unseated lands for taxes.*

A tract of land, assessed as unseated, for the years 1796, 1799, 1801, 1802, 1803, and 1804, and which had remained vacant and unseated until the autumn of 1799, when an intruder entered upon, and cleared a portion of it, and in 1800, and the following year, sowed a few acres of grain, and then abandoned the possession in the winter of the latter year, after selling the grain in the ground to a third person, who reaped it the next year, from which time the land continued unoccupied

until the year 1810; it may rightfully be sold for the non-payment of the taxes assessed at a time when no person was in the actual occupancy of said lands.

A copy of the warrant issued by the commissioners to the sheriff, to sell unseated lands for taxes, which was not certified in the form prescribed by the act of the 15th of April, 1834, is not evidence; but where it was exhibited merely to lay the foundation for the introduction of the sheriff's deed, which was admissible without it, its reception is not such injurious error as calls for the reversal of a judgment.

The acknowledgment of a sheriff's deed, which was proved only by the certificate of the prothonotary endorsed upon it, is made evidence by the act of 5th April, 1842.

Sales of unseated lands for taxes, pursuant to the laws passed prior to the act of 1815, conferred no title upon the purchasers, in the absence of proof of a strict and minute compliance with the various directions of the statutes regulating the subject, as against the title of the real, original owner; and the *onus* of showing this compliance rests on those claiming under such sales.

But this rule does not extend to, nor shield a mere intruder upon such lands, who is a trespasser, and enters without right: against such a person, the law clothes a purchaser at a tax sale with the constructive possession; and the production of the commissioners' or treasurer's deed, is sufficient as a *prima facie* title, to entitle him to recover the lands, or to put the intruder upon proof of a better title.

One who holds possession, not adversely, but in subserviency to a title, can gain no right against it, by the statute of limitations.

But where one enters without knowledge of a tenancy, and irrespective of it, in the assertion of a title on its face adverse to the lessor, although derived from the tenant, his possession will be hostile, if unequivocal acts and declarations manifest an intent to hold in despite of all others.

It is not necessary, in order to engraft the elements of exclusiveness and hostility upon such possession, that a party should expressly declare his intention thus to hold.

Of all the acts that have been recognised as indicative of hostile intent, no one is more decisive than the exhibition of a paper title independent of that existing in the original owner, by virtue of which a party justifies his entry.

Where one, unaware of the transactions between the owner and his tenant, which attached upon the possession of the tenant, modifying and controlling its character, and looking only to the apparent paper title, of the person originally in possession, and which was regularly transmitted by conveyances duly recorded, purchased it for a valuable consideration, and asserted it as the evidence of his right, and entered into possession, *such entry* must be considered as adverse to the title of the owner, because made under colour of an adverse title, and therefore admitting of no other construction.

As an *antagonist* fact, it is of no value that the title of the true owner was on record in the county in which the land was situated; for an adverse holding is necessarily invoked only as productive of a legal title, springing, by the operation of time, from that which, in its origin, was a tortious intrusion; and it may exist as well when the intruder has notice of a superior title, as when he acts in ignorance of it.

Leasing, conveying, or devising land, extensively improving it, and receiving the issues and profits, are the highest acts of ownership which can be exercised over land; and the exercise of these acts strongly characterizes the possession with exclusiveness and hostility.

A. took possession of the land in dispute, under colour of title derived from B., who originally entered as the tenant of C., who was the true owner. After an occupancy of one year, during which time A., and those claiming under him, treated the land as their own, they acknowledged the title of C., and agreed to hold subject to him as his tenants, their occupancy, however, continued as it was before, without any visible change; and, after the lapse of five years, they sold the property as their own to D., for a valuable consideration, and executed to him a deed in fee-simple, which recited the conveyance from B. to A. without notice of the agreement between A. and C. D. took possession by virtue of the conveyance to him, claiming to hold

the land as owner; and he, and those to whom he demised and conveyed it, exercised over it acts of ownership indicative of an exclusive and hostile possession as against all the world, for a period of upwards of *twenty-one years*, without question or interruption.  In ejectment by C., against those claiming under D., *held*, that it was error to charge the jury, that the defendants, as purchasers under A., could not set up *twenty-one years' possession* as a bar to plaintiff's recovery.

IN error from the Common Pleas of Susquehanna county.

*July* 12.  This was an action of ejectment brought to recover three hundred and thirty-eight acres of land, in which Archippus Parrish was plaintiff, and Miles Dikeman, Asher B. Leamans, Tyler Carpenter, and Joel S. Tingley, were defendants.  The case was tried at a special court, held by ANTHONY, P. J.  On the trial, the plaintiff gave in evidence a warrant to Andrew Allen for three thousand acres of land, dated August 20, 1774, situated on the waters of the Meshoppen, and survey thereon, in September, 1775, for three thousand and eighty-seven acres, thirty-nine perches: in lots from No. 1 to No. 10, inclusive.  The defendants admitted that lot No. 10, containing three hundred and thirty-eight and a half acres, was in their possession; that it was part of the three thousand acres described in the warrant and survey of Andrew Allen, and that it was the lot claimed by the plaintiff in this ejectment.  The plaintiff then offered in evidence a list of unseated lands, entered in a book in the commissioners' office; the assessment of unseated lands entered in a book in the commissioners' office; the entries in the day-book of the commissioners' office of the appointment of their clerks; a list in the handwriting of one of their clerks, of the unseated lands of delinquents; a list of original sales of unseated lands for taxes, by the sheriff; and called a witness, who was clerk of the commissioners, who proved that the lists, assessments, &c., offered in evidence, were contained in official books, and on official papers belonging to and remaining in the commissioner's office.  The defendants objected to the books, lists, and papers offered in evidence; but the court admitted the evidence, and sealed defendant's *first, second, third* and *fourth* bills of exception.

The plaintiff then offered in evidence a certified copy of the original warrant, which could not be found, signed by the board of commissioners, dated 4th September, 1805, directed to the sheriff to sell for taxes, for the years 1796, 1799, 1801, 1802, and 1804; and which copy was certified on the 10th April, 1824, by the board of commissioners of that year.  Objected to by the defendant, but admitted by the court, who sealed defendant's *fifth* bill of exception.

The plaintiff then gave in evidence, under objection by defendants, a deed, dated August 29, 1807, from the sheriff to Roswell Wells, for three thousand and eighty-seven and a half acres of land, in which was recited the warrant to sell for taxes for the above-stated years. This deed was acknowledged, in open court, on the 29th of August, 1807, and the acknowledgment proved by the certificate of the prothonotary endorsed thereon. This was defendant's *sixth* bill.

The plaintiff then read in evidence a deed, dated 29th March, 1810, from Roswell Wells to Archippus Parrish, sen., for lots Nos. 7, 8, 9 and 10, which included the land in controversy in this suit. This deed was recorded in Luzerne county, on the 28th of January, 1811; *Susquehanna county, in which the land conveyed is now situated, not being at that time organized for judicial purposes.* These lands, it appeared, were subsequently mortgaged by Archippus Parrish, sen., to Amory Gamage; and under a writ of *scire facias,* issued on this mortgage, at the suit of Amory Gamage, for the use of Archippus Parrish, jun., in the District Court of the United States for the Western District of Pennsylvania, judgment was obtained on the 7th of November, 1836, for $5121 12. On this judgment a writ of *levari facias* was issued, and the land mortgaged, viz. : lots Nos. 7, 8, 9 and 10, sold to Archippus Parrish, jun., who received the marshal's deed for the same.

It appeared from the evidence adduced on the part of the defendants, that the large tract covered by the Allen warrant and survey, which included lot No. 10, the land in controversy lay vacant until the autumn of 1799, when one Tarbox entered on lot No. 10, cleared a small portion of it, and, in 1800 and 1801, sowed about seven acres in grain. In the winter of the latter year he abandoned the possession, after selling the grain in the ground to one Torrey, who reaped it the next year. From that time until 1810, the land remained vacant, when one Oliver Graytracks took possession of the clearing, subjected it to a course of cultivation, and built a barn in 1815 or 1816. When Graytracks left, he had cleared about forty acres, and had sixty acres under fence. He was engaged in the lumbering business, and occasionally returned to the land. The defendants gave in evidence a deed of conveyance of the land in question, from the said Oliver Graytracks, to Daniel McMillan, dated September 3, 1817, which was acknowledged and recorded on the 5th of same month; a deed, in consideration of natural love and affection, from Daniel McMillan, to his sons John and Angus McMillan, dated April 30, 1822, and

acknowledged and recorded on the 5th of May, 1822; and also two deeds, made for valuable considerations, from John and Angus McMillan respectively, to Elkanah Tingley, for their respective undivided moieties of the land; the one from John bearing date 16th April, 1823, and the other from Angus, bearing date May 1, 1823, and each duly acknowledged and recorded. They also gave in evidence the record of a judgment confessed in August, 1820, by Daniel McMillan, John McMillan, and Alexander McFarland, upon which legal process was issued, and the land sold as the property of McMillan, to Tingley, by the sheriff, who conveyed it to the purchaser by deed, dated January 19, 1824. The defendants then gave in evidence a regular chain of title, by legal conveyances, from Tingley down to the present defendants.

The plaintiff then gave in evidence an article of agreement between Archippus Parrish and Daniel McMillan, dated November 2, 1817, by which Parrish agreed to sell to McMillan, for the consideration therein mentioned, one tract of land lately occupied by Oliver Graytracks, supposed to contain three hundred acres, and another tract adjoining that, on which McMillan then lived, and containing one hundred and one acres. It appeared, that previously to entering into this agreement, McMillan called on Parrish and informed him, that he had bought out the improvement of Graytracks on his, Parrish's land, and on which he, Graytracks, had entered under a verbal lease from Parrish; that he wished to purchase of him, Parrish, three hundred and fifty-five acres, including the Graytracks improvement; whereupon the article of agreement was entered into, as above stated. It also appeared, that in a year after his purchase, McMillan not being able to meet his payments, got Parrish to take back the land and pay him for improvements made; that he entered into an agreement with Parrish, in which he recognised and fully admitted the superior right of Parrish, submitting the valuation of the improvements to three men; and that after the award, McMillan agreed to occupy the land in question as the tenant of Parrish. It also appeared that one-fifth of three-fourths of the land in controversy was forfeited to the Commonwealth by the attainder of Andrew Allen, the original warrantee, in 1779, for high treason; and that his lands were not restored to him by his pardon, in 1792. Other evidence was given, which it is not necessary to notice here.

After the evidence was closed on both sides, the defendants propounded *seven* points, on which they requested the court to charge the jury; but as the answers of the court to the *third, fourth,* and

*fifth* points propounded are only assigned as errors here, it is unnecessary to refer to the others.

The following were the *third, fourth,* and *fifth* points:

3d. That even if the said Roswell Wells took a good title under the sheriff's deed to him, of August 29, 1807, yet the defendants, having shown a continued possession under deeds of conveyance duly recorded, from September 3, 1817, to the commencement of this suit, December 17, 1844, are protected by the statute of limitation, and that the plaintiff cannot recover the said lands.

4th. Elkanah Tingley, having purchased from John and Angus McMillan, and took his deeds from them respectively, of April 16, 1823, and May 1, 1823, by deeds recorded May 3, 1823, the said McMillans then holding by deed from their father, Daniel McMillan, duly recorded, and he, by deed from O. Graytracks, also duly recorded. If the jury find that the said E. Tingley, and those claiming under him, continued in possession until the commencement of this suit, December 17, 1844, a period of more than twenty-one years, the plaintiff cannot recover, being barred by the statute of limitation.

5th. That, if the jury find that possession was taken by Oliver Graytracks prior to any contract with Parrish for the purchase of the land from him, or if McMillan purchased and went into possession without notice of such contract, and was in possession under such purchase from Graytracks, prior to and at the date of his contract, to wit, November 2, 1817, then in such case, the said contract is not binding on said McMillan, unless said Parrish show a good and valid title to said lands.

To the *third point* the court answer—That the continued possession under deeds of conveyance duly recorded, from September 3, 1817, to the commencement of the ejectment on the 17th December, 1844, does not protect the defendants under the statute of limitation, nor prevent the plaintiffs' recovery in this suit.

To the *fourth point* the court answer—That if the jury believe that Elkanah Tingley and those claiming under him have continued in possession for more than twenty-one years before this ejectment was brought, having obtained deeds, as stated in this point, from the persons therein named; yet they are not entitled to hold the land in controversy, by virtue of twenty-one years' adverse possession, so as to bar the plaintiff's recovery by the statute of limitation. The sheriff's deed to Roswell Wells, and record thereof, in Luzerne county Court of Common Pleas, and the deed from Roswell Wells to Archippus Parrish, and record thereof in the Re-

corder's office of Luzerne county, while Susquehanna was a part of Luzerne, were sufficient notice of the title of Archippus Parrish to affect the purchase of the right of Daniel McMillan; and those claiming under him cannot set up the statute of limitation, as a hostile possession, although they may have held the land by virtue of conveyances from Daniel McMillan more than twenty-one years before suit brought.

To the fifth point the court answer—Whether Oliver Graytracks took possession of the land in controversy before or after any contract with Parrish, would not alter the title of Parrish to the land, when he made the contract with Daniel McMillan on the 2d November, 1817. The land was surveyed land when Graytracks took possession. He was, therefore, an intruder on the land of R. Wells, (if before the sale by Wells to Parrish,) and could gain no right as such, to such land, unless he should hold it adversely for twenty-one years. McMillan, by purchasing of Graytracks, could acquire no better right than Graytracks had. If McMillan purchased of Graytracks without any notice of a contract between Graytracks and Parrish, he could hold that contract in the same manner that Graytracks did; but if McMillan afterwards entered into a contract with Parrish, he would not be bound by it, unless Parrish could comply with his part of it. And if McMillan had offered a compliance on his part, then Parrish must have shown a good title to the lands; but as the defendants do not set up the contract as a defence, it cannot prevent the plaintiff's recovery.

The defendants excepted to the charge of the court. The jury found a verdict for plaintiff, whereupon the defendants sued out this writ and assigned the following errors:

1. The court erred in overruling the objection by defendants' counsel to the book purporting to be a "notice of taxes due on unseated lands, 1796, 1799, 1801," and in permitting the same to go to the jury as evidence.

2. The court erred in overruling the objection so made to the book purporting to be a day-book of entries of the commissioners of Luzerne county, and in admitting the book.

3. Also, in admitting the book endorsed, "Unseated Land Delinquents."

4. Also, in admitting the book of original sales of James Wheeler, sheriff, unseated lands for taxes, 1805, 1806, and 1807.

5. Also, in admitting the certified copy of commissioners' warrant to James Wheeler, sheriff, to sell, &c., dated September 4, 1805.

6. Also, in admitting in evidence the deed of James Wheeler, sheriff of Luzerne county, to Russell Wells, dated August 29, 1807.

7. The court erred in charging the jury that the defendants cannot set up any irregularity in the assessment of taxes, or the sale of the land for them, to defeat the sheriff's deed to R. Wells, of August 29, 1807, and in saying that said land was properly sold as unseated.

8. The court erred in charging the jury that the written agreement of McMillan with Parrish, the reference to men, the holding of possession of the hundred and one acres, and the written recognition of title in A. Parrish by McMillan, would have prevented him from setting up the statute of limitations.

9. They erred in charging the jury that the recording of A. Parrish's title in the proper county, was sufficient to affect those who claimed under D. McMillan, with notice of that title, and they, as purchasers from him, cannot set up twenty-one years' possession, under a title derived from him, as a bar to plaintiff's recovery.

10. The court erred in their answer to the third point submitted to them by defendant's counsel.

11. They also erred in their answer to the fourth point submitted to them by defendant's counsel.

12. Also, in their answer to the fifth point submitted by defendant's counsel.

*Little* and *Streeter*, for plaintiffs in error.—The tax sale under which plaintiffs claim, having been made prior to the act of 1815, should have been supported by proof of all the pre-requisites to such sale: Rex *v.* Clarke, 1 Cowper's Rep. 26; act of 1784. Here was no proof of the proper assessment of taxes for any year, nor that the warrant for the sale was issued by a legally constituted board of commissioners, nor that the sheriff, who (about two years after its date) seems to have executed it, was properly qualified for that purpose; nor that the land was advertised; nor, indeed, of any of the steps then required by law to give validity to such a sale. There was no such proof of loss of, and search for the original, warrant, as justified the court in admitting a paper purporting to be a copy, and which was without force from any fact, except that it happened to be found in the commissioners' office. The deed to R. Wells was not properly received, without better evidence of its acknowledgment than a memorandum of that fact made upon it. The docket of the court should contain such an entry, and, containing it, should be produced. Besides, on its face it shows a sale for

taxes due in 1796, 1799, 1801, 1802, and 1804. The proof by us was, that this land was seated and cultivated by one Tarbox, as early as 1799. This sale was not until 1807, and that, (with perhaps the exception of 1796,) for taxes accruing while it was seated land, and therefore exempt from sale. Upon this question of seating, we gave much evidence; and it was manifest error in the court to charge the jury that defendants could not impeach this deed and title.

The case of Foust v. Ross, 1 Watts, 501, does not rule this. There the defendant gave no evidence whatever, and was a mere intruder, without rights of any sort. Here the defendants present a case of clear right, a title upon which they could maintain an ejectment; for the statute of limitations confers a title as much favoured by our law, as any other. Now, it was ruled in Foster v. McDivit, 9 Watts, 344, that, as between the former owner and purchaser, the doctrine of Foust v. Ross could not apply; nor is there more reason why it should operate here.

Did the transactions between McMillan and Parrish (two hostile claimants) take from the possession of the former its adverse character? First, they rely upon the contract of purchase. This was afterwards waived, and cancelled, by the agreement of submission made by those parties; and cannot, therefore, be now used for any purpose, by either party. Its implied admissions of title could not thereafter affect Daniel McMillan; much less E. Tingley, a *bonâ fide* purchaser, without knowledge even of its spent existence. The submission and award were but efforts to compromise their conflicting claims in this land.

They argued, that Elkanah Tingley acquired a title from the McMillans, which the lapse of twenty-one years would for ever quiet and repose. Graytracks, the improver, sold to Daniel McMillan. This *recorded* title, Tingley bought; a title, upon its face, hostile to the whole world; and, with his successors, adversely held it twenty-one (and more) years longer. He paid for a title that reached many years back of the unknown negotiations between McMillan and Parrish, and began before the claim of Parrish had an existence. He, therefore, is not to be affected by the relation of landlord and tenant (even if that existed) between McMillan and Parrish, of which he had no notice. The court concede this, if it were not for the recording of the Parrish deed in Luzerne county, which they say is to us constructive notice! Constructive notice of what? Simply, at most, of the fact that such a deed and claim was so outstanding.

To E. Tingley, that Luzerne county record could be no notice of the separate and independent fact alleged, of tenancy by McMillan. The doctrine of constructive notice has never been pushed into such monstrous injustice. Knowledge of the one fact would by no means lead to knowledge of the other. And the principle now contended for is distinctly ruled in Moyer *v.* Zieber, 3 Barr, 242.

*Butler* and *Ward,* contrà.—We claim the land in question under a sheriff's sale for taxes previous to the act of 1815. In an action of ejectment founded upon such title against those who hold under one who had entered without right, it is sufficient to show that the title to the land in dispute was out of the Commonwealth, and that it is held by a deed from the sheriff, who sold for the non-payment of taxes. This is such a *prima facie* title as puts the defendant to the necessity of showing a better right; 1 Watts & Serg. 501. In this case, at most, but one individual fifth of three-fourths, or three-twentieths of land, was vested in Andrew Allen, at the time of his attainder for high treason; and by such attainder no more than that interest returned to the Commonwealth. So that the land claimed here (except as to this three-twentieths) was rightfully subject to assessment and sale for taxes; and even as to the excepted interest, under the intimation of the Supreme Court, 4 Watts, 151, from the length of time which the Commonwealth has neglected to assert its claim, the jury had a right to presume a grant. Having thus acquired a recorded title, the land is entered upon under us, by one under whom the plaintiffs in error claim; articles of agreement of sale and purchase are subsequently made; these followed by a written submission and award with regard to the possession of the land; and finally, a leasing of the same. The statutes of limitation do not, under these circumstances, apply to this case.

*June* 27. BELL, J.—As a leading subject of inquiry, this record *first* presents the question, whether the plaintiff below exhibited such a *prima facie* title to the land in controversy, as put him in a position to call upon his adversary to show a better, in bar of his claim to recover the possession. The validity of the warrant and survey, by virtue of which an estate in three thousand acres, situate on the waters of the Meshoppen, was acquired by Andrew Allen and his associates, Benjamin Chew, Samuel Meredith, Edward Shippen, Joseph Shippen, and Robert Wilson, is not questioned; nor is the fact disputed, that this land was afterwards

sold, as unseated, by James Wheeler, the then sheriff of Luzerne county, to Roswell Wells, for non-payment of taxes assessed on the track in the name of Andrew Allen, and a deed therefor, duly executed and delivered by the sheriff to Wells, from whom the plaintiff deduces title, on the 29th of August, 1807. But the validity of this sale, as a means of passing the title of the warrantees, is impeached on *two grounds*. *First*, that the particular tract, the subject of this action, was actually seated when a portion of the taxes, for the non-payment of which it was subsequently sold to Wells, was assessed upon it. And, *secondly*, that the plaintiff failed to show a strict and literal adherence to the directions of the several statutes which then regulated the taxation of unseated lands, and the sale of them for non-payment. The first of these objections may be disposed of in a few words. It appears from the evidence adduced on the trial, that the large tract covered by the Allen warrant and survey, comprehending the land now in dispute, and designated in the survey as lot No. 10, was first assessed for taxes in Luzerne county in the year 1796, and again in the years 1799, 1801, 1802, 1803, and 1804. The whole tract remained vacant until the autumn of 1799, when an individual named Tarbox intruded on lot No. 10, cleared a small portion of it, and in 1800, and the following year, sowed about seven acres of grain. He, however, abandoned the possession in the winter of the latter year, after selling the grain in the ground to one Torrey, who reaped it the next year. From this time, the land was abandoned until about the year 1810, when one Graytracks took possession of the clearing, and subjected it to a course of culture. In the mean time, it had, as we have seen, been sold for the payment of the taxes assessed upon the whole track for the years already mentioned, as appears by the sheriff's deed. It is certain, that in 1796, and when the tax was assessed for the year 1799, the land presented an unbroken forest, uninhabited by man. This, of itself, was sufficient to justify its subsequent sale for non-payment of taxes, at a time when no person was in the actual occupancy of it. But in addition to this, there is evidence, which was fairly submitted to the jury, that after the year 1802, it was totally abandoned, and suffered to relapse into its original condition of wildness, uncultivated and uncared for, until re-occupied by one wholly unconnected with the original possession, in the year 1810. If this were so, the taxes assessed upon it in the *intermediate time*, as an unseated tract, were properly laid; and the non-payment of these fully warranted its sale by the public authorities, in compensation of the

delinquency of its owners. On the trial, however, several bills of exceptions were sealed at the request of the defendant, to the evidence introduced by the plaintiff, for the purpose of establishing some of the facts to which I have adverted. These exceptions may, not inconveniently, be now considered. The *first, second, third,* and *fourth* relate to certain official books and papers kept in, and belonging to the office of the commissioners of Luzerne county, duly proved by official persons connected with the office and its records. Certainly, no objection could be raised against them on the score of irrelevancy; for they went to prove the important facts of the taxation and sale of these lands as unseated. Nor are they liable to the imputation of incompetency, as instruments of proof. It has long been the practice to receive, as legal evidence, documents of this character, when sufficiently identified, in which are recorded the public transactions of the county commissioners, as public functionaries, intrusted with the discharge of important duties. The rule that admits them as testimony is indeed indispensable to the safety of the community, and, therefore, springs from necessity; for to exclude them would be, in a large class of cases, to shut out the light from the only source whence it could be derived. It is, indeed, but the long-established law of evidence, which regards official papers of public agents, as proof in themselves of the subject to which they relate: Lewisburg *v.* Augusta, 2 Watts and Serg. 69: the application of which, in the present instance, is fully sustained by Foust *v.* Ross, 1 Watts & Serg. 501. But the competency of these documents does not altogether rest upon the common-law rule; for the 20th section of the act of the 15th April, 1834, requires the county commissioners to appoint a clerk to keep the books and accounts of the board; to record and file their proceedings; and the 21st section makes copies thereof evidence. Of course, within the spirit of the act, the original papers are also evidence: 10 Watts, 76. The *fifth* bill of exception is directed against the ruling of the court below, admitting as evidence a certified copy of a warrant of sale, purporting to have been issued by the commissioners of Luzerne county, to the sheriff, dated September 4, 1805. As it does not appear this paper was certified in the form prescribed by the act just cited, it was possibly obnoxious to the objection of being insufficiently proved; but as it was exhibited merely to lay a foundation for the introduction of the sheriff's deed, which was admissible without it, its reception is not such injurious error as calls for the reversal of the judgment. It is indeed said, that the acknowledgment of this instrument being

proved only by the certificate of the prothonotary endorsed upon it, it ought not to have been received in evidence, upon the rule established by Bellas *v.* McCarty, 10 Watts, 21, and Patterson *v.* Stewart, Ibid. 470. But this objection overlooks the act of 5th April, 1842, making such certificates sufficient evidence of the sheriff's acknowledgment. Having thus disposed of the exceptions to evidence, we may approach, unembarrassed by them, the consideration of the second objection raised against the sheriff's sale and conveyance to Wells, as an effective assurance. This objection is based upon the oft-repeated decisions of this court, that such a tax sale, made prior to the act of 1815, conferred no title on the purchaser, in the absence of proof of a strict and minute adherence to the various directions of the statutes regulating the subject : the *onus* of showing which rested on him, who claimed by virtue of the sale. But the application of this rule, productive as it was of much inconvenience, if not positive injustice in a great variety of instances, is said to have always been restrained in its application, to the protection of the title of the original owner. It was never permitted to intervene, to shield a mere intruder on the land sold ; and the principle is now firmly established, that as against a trespasser without right, the constructive possession with which the law clothes a purchaser at a tax sale, is sufficient. " All that is necessary," says Mr. Justice Rogers, in Foster *v.* McDivit, 9 Watts, 344, " to a plaintiff in ejectment, in the first instance, after showing title out of the Commonwealth, as against an intruder, is to prove an actual possession ; or where the land is sold for taxes, to exhibit the deed from the commissioners, or treasurer. This is such a *primâ facie* title as is sufficient to put the defendant on proof of a better right. · The action of ejectment is intended to try the right to the possession ; and from this it follows, that an actual possession, or a constructive possession, which results from a purchase at a treasurer's sale, and the subsequent payment of the county rates, is good against a person who enters without right." This doctrine is fully sustained by the late case of Foust *v.* Ross, *suprà*, in which the remarks I have extracted are cited with approbation. In our case, the plaintiff below, after showing the Commonwealth had parted with the land, and that it had been assessed for tax in the name of the warrantee, gave in evidence the deed of the sheriff, which was, at least, potent enough to put a stranger to the original title on his defence. But the plaintiff went far beyond the simple exhibition of the deed, for he gave proof, that immediately after the conveyance from Wells to Parrish, the elder,

the latter entered into the actual possession of the land by his tenants, which was continued down to the year 1823, commencing with Graytracks, who entered, as Parrish shows, under a verbal lease from himself, and including the occupancy of the McMillans, father and sons, the latter as volunteers standing in the shoes of their father, and therefore subject to his disability to deny the title of his lessor. If, then, it be conceded, that as against the defendants below, who claimed by colour of title, acquired upon a valuable consideration, something must be added to the sheriff's deed to give it sufficient solidity and firmness to support an estate—though I am inclined to think that, without this, it would afford a competent foundation—we have that, which, for such a purpose, is much more than equivalent to the payment of county rates; for that, at best, amounts to but a constructive possession; while here there was an actual possession, and that, too, in the persons of those under whom the defendants claim. In this state of fact, they cannot be permitted to treat the deed made to Wells as a nullity, only because the lapse of time, in its progress, has swept away, one by one, the evanescent instruments employed to effect the sale, and, with them, the only means of proof that the requirements of the older statutes were obeyed. Standing in a position, not within the overshadowing protection of decided cases, the defendants possess no such peculiar merit as should make us seek to place them there, by an extension of the principles of those decisions. There is, certainly, nothing in the rule established by them, to recommend an extension of its applicability. On the contrary, considerations, as well of private right as of public policy, may be invoked as opposed to any attempt to enlarge the circle within which its operation has hitherto been confined: considerations, which, it is known, caused legislative interference prospectively destructive of the doctrine of the earlier cases. The defendants can advance no other claim to favour, so far as the point now under consideration is involved, than that they have paid, in good faith, their money for the lands of which they have the possession; but this, if true, places them in no better category than with those who, from ignorance, carelessness, or mistake, buy a worthless title, but whose mouths are closed by the maxim, *caveat emptor*. The plaintiff was then entitled to require the defendants to establish a right superior to that he had *prima facie* shown in himself. Responding to this call, they gave in evidence a deed of conveyance of the land in question, from Oliver Graytracks to Daniel McMillan, dated September 3, 1817, acknowledged and recorded on the 5th of the same month; a deed

in consideration of natural love and affection, from McMillan to his sons John and Angus McMillan, dated April 30, 1822, acknowledged and recorded May 15, 1822, and two deeds made for valuable considerations, from John and Angus McMillan, to Elkanah Tingley, for their respective undivided moieties of the land, bearing date the 16th of April, and 1st of May, 1823, and acknowledged and recorded on the 3d of the last-mentioned month.   Besides these conveyances, they exhibited a judgment confessed on the 7th of August, 1820, by Daniel McMillan, John McMillan, and Alexander McFarland, upon which legal process was issued, and the land sold, as the property of McMillan, to Tingley, by the sheriff, who conveyed it to the purchaser by deed, dated January 19, 1824; and from Tingley a regular chain of title is deduced, by legal conveyances, down to the present defendants, or some of them.   Conceding the plaintiff's title to be good in its inception, the defendants insist, they have acquired an indefeasible estate in the premises, by operation of the statute of limitations.   It is pretty certain, however, they can derive no benefit from the previous possession of Graytracks and the McMillans, father and sons; for it appears to be very clearly established that they held the land, not adversely to Parrish, the elder, but in subserviency to his title; or, if any doubt should exist as to the nature of Graytrack's possession, it cannot be questioned that McMillan by his agreements, first for a purchase of the land, and afterwards by his submission to an award, fully recognised Parrish's superior right; and his final attornment, as tenant, disarmed him of the power to impeach the title of his lessor, and still more, to assert a hostile possession, which in the end might prove destructive of it.   An attempt was made on the argument, to assimilate his course, in this particular, to that pursued by the parties in possession of the lands litigated in Sailor v. Hertzog, 4 Wh. 259, and Bell v. Hartley, 4 Watts & Serg. 32; but it was in fact so broadly dissimilar as to forbid any attempt to institute a parallel.   Those were, at most, confessions that the true titles were not held by the occupants, accompanied by offers to purchase a compromise.   This was an unequivocal acknowledgment of a paramount right, followed by a distinct agreement to hold the possession subservient to and in dependence upon it.   There, there was nothing to create a false confidence, inducing the true owners to sleep upon their rights.   Here there was every thing to lull the landlord into a feeling of security, naturally leading him to rely on the agreement of one who occupied the lands but by his sufferance and permission.   To suffer the latter to convert this permission into a

weapon of offence against the elder right, would be to assist him in the perpetration of a fraud, upon the faith which sprung from his own solemn contracts. But we are of opinion, that the relative position of Parrish and Tingley, after McMillan's conveyance to the latter, was very different. So far as is shown, there was no circumstance attending his entry on the land, operating to limit him to the assertion of a merely subordinate possession. It is undoubtedly true, as a general rule, that one entering by the sufferance and permission of the tenant of another, will himself hold that relation to the lessor. And the law will not permit him to assume an attitude hostile to the title under which his occupancy commenced: Graham *v.* Moore, 4 Serg. & Rawle, 467. Having placed himself in the shoes of the tenant, he is bound by the allegiance a lessee owes his lessor, and cannot throw it off at will. And the case is the same, where an adverse claimant, by tampering with his adversary's tenant and seducing his fidelity, gets into possession, or by collusion with the latter, recovers a judgment in a possessory action: Cooper *v.* Smith, 8 Watts, 536; Stewart *v.* Roderick, 4 Watts & Serg. 188. But where one enters without knowledge of the tenancy, and irrespective of it, in the assertion of a title on its face adverse to the lessor, though derived, as here, from the tenant; his possession will be hostile, if unequivocal acts and declarations manifest an intention to hold in despite of all others. Nor is it necessary, in order to engraft the elements of exclusiveness and hostility upon such a possession, a party should expressly declare his intention thus to hold. As in the case of tenants in common, the character of the entry and subsequent possession may be as conclusively established by the attending facts, as by the most formal proclamation. Where these demonstrate an adverse intent, continued for a sufficient length of time, it is equivalent to actual *ouster;* and this, though in contemplation of law, the entry of the co-tenant is *primâ facie* the entry of all. Of the facts that have been recognised as indicative of hostile intent, none are perhaps more decisive than the exhibition of a paper title, independent of that residing in the original owner, by colour of which the party justifies his entry. Thus it has been held, that if one tenant in common sell the whole of the land, and possession be taken of the whole by the purchaser, he will be considered as entering adversely to the co-tenant; because he entered under an adverse title, and not as co-tenant: Cullen *v.* Motzer, 13 Serg. & Rawle, 356. And the doctrine of this case has been applied even in the absence of documentary evidence of title; for where A. and B. were tenants

in common by agreement and payment of equal parts of the price of land, and B. took possession and died; whereupon his children entered upon the land and occupied it as their own, without knowledge of the title of A., they were held to have such an adverse possession, as, by lapse of time, barred the claim of A.: Brown v. McCoy, 2 Watts & Serg. 307, *in note.* The principles announced in these and other cases are of easy application to the case in hand. Unaware of the transactions between Parrish and McMillan, which attached upon the possession of the latter, modifying and controlling its character, Tingley, looking only to the apparent title of Graytracks, which seemed to have commenced in 1810, and was regularly transmitted by conveyances, duly recorded, to the McMillans, purchased it for a valuable consideration, and, asserting it as the evidence of his right, entered into possession of the land conveyed to him. This entry must be considered as adverse to the title of Parrish; because made under colour of adverse title, and therefore admitting of no other construction. Nor is it of any value as an antagonist fact, that Wells's deed to Parrish was of record in Luzerne county, thus visiting Tingley with constructive notice of that conveyance; for an adverse holding is necessarily only invoked as productive of a legal title, springing by the operation of time, from what, in its origin, was a tortious intrusion; and it may exist as well where the intruder has notice of a superior title, as when he acts in ignorance of it: nay, notice of another right, if it be unacknowledged, but adds vividness to the colour of title with which the disseisor invests the disseisin, and impresses upon it still more distinctly the sign of hostility. I have said that Tingley purchased and accepted a conveyance, unaware of the previous private arrangement and agreements between Parrish and McMillan. Such upon the proofs must be taken as the fact; for we cannot agree with the court below, that the registry of Parrish's deed affected those claiming through the McMillans, with notice of all the incidents attending that title. The registration was notice of nothing but that which appeared on its face, or to which it naturally pointed the inquirer; and this cannot be affirmed of it, in reference to the secret transactions of Parrish and McMillan. In addition to the almost unerring test of Tingley's intent, furnished by the deed under which he claimed, the case abounds with evidence, that the original exclusiveness and hostility always characterized the subsequent possession. He, and those claiming under him, have at all times exercised the highest acts of dominion over the property, by leasing, devising, and conveying it; by extensively

improving it, and by receiving the issues and profits; nor is there a *scintilla* of proof, that for a moment, during the lapse of *twenty-one years*, which ran between the inception of their title and the impetration of this suit, they faltered in their claim of absolute and exclusive ownership, or that Parrish and those deriving title from him, at any time during that period, brought the asserted ownership into question. It is almost impossible to believe he was ignorant of the pretensions of the actual occupants; but whether he had notice of them or not, is of no consequence, so far as the question of adverse possession is involved. The character of adverse possession, says Mr. Justice Sergeant, is given, not by proving notice to persons interested, but by the nature of the acts done by the party. To constitute disseisin, it was never held to be requisite, that notice should be sent to the disseisee, or that it must be proved he had knowledge of the entry and ouster committed on his land: Lodge *v.* Patterson, 3 Watts, 77. From what has been said, it will be perceived, the court below committed an error in saying to the jury that the defendants, " as purchasers under Daniel McMillan, cannot set up twenty-one years' possession, under title derived from him, as a bar to plaintiff's recovery." The instruction should have been, that if the jury believed Tingley's original entry was exclusive of and adverse to, the title of Parrish, and this adverse possession continued uninterruptedly for twenty-one years from the inception of his claim in 1823, of which there is very satisfactory proof; it constituted a constructive ouster, and, by the operation of the statute of limitations, conferred an indefeasible estate in fee, against which the plaintiff was not entitled to recover. In arriving at this conclusion, we are not unmindful of the case of Stockwell *v.* Robinson, 1 Barr, 477, which, superficially examined, might seem to point to a different doctrine. But that case did not turn upon the efficacy of the statute operating upon a possession so commenced; nor was it determined upon the point we have last considered.

It will be perceived, nothing has been said on that part of the case depending on the attainder of Andrew Allen for high treason, as it was not made matter of exception here. Though the errors assigned have not been discussed in detail, it is believed, what has been said covers them all, rendering further notice unnecessary. For the error pointed out in the charge of the court;

The judgment is reversed, and a *venire de novo* awarded.